443 So.2d 1042 (1983)
Kenneth B. SMITH and Elizabeth J. Smith, Appellants,
v.
TAYLOR COUNTY PUBLISHING COMPANY, INC.; Alma E. Tapers; Live Oak Publications, D/B/a the Perry News Herald; and Doris Morgan, Appellees.
No. AN-103.
District Court of Appeal of Florida, First District.
December 30, 1983.
*1044 W. Crit Smith of Boyd & Smith, P.A., Tallahassee, for appellants.
Arthur C. Beal, Jr. of McConnaughhay, Roland & Maida, P.A., Tallahassee, for appellee, Live Oak Publications.
C. Gary Williams and Michael J. Glazer of Ausley, McMullen, McGehee, Carothers & Proctor, Tallahassee, for appellees, Taylor County Publishing Company, Inc., Alma E. Tapers, and Doris Morgan.
JOANOS, Judge.
Kenneth B. Smith and Elizabeth J. Smith appeal from a final order dismissing their complaint with prejudice for failure to state a cause of action. We affirm in part and reverse in part.
The Smiths are the principals of Taco Printers, Inc., which publishes a newspaper in Taylor County entitled, "The Taco Times." Appellee Live Oak Publications, Inc., currently publishes "The Perry News-Herald," the other Taylor County newspaper. Taylor County Publishing Co., Inc. previously published that newspaper.
Three articles printed in "The Perry News-Herald" are the subject of this libel suit. The first article was a "letter to the editor," written by a Buddy Sadler and printed on December 18, 1980. It dealt with Sadler's personal opinion about the tactics of the Taco Times. The second article was a "news story," which was printed on December 24, 1980. It reported an alleged physical confrontation between Kenneth Smith and Buddy Sadler. The third article was a "column," which was also printed on December 24, 1980 by Doris Morgan, the Editor of the Perry News-Herald, entitled "Barbs We Ignore, But Physical Violence is Something Entirely Different." The "column" dealt with the alleged confrontation between Smith and Sadler as well as an alleged earlier confrontation, taking place in 1963 between Smith and Bill Griffin, the then News-Herald Editor.
The Smiths alleged that the three newspaper articles contained false and defamatory statements, all of which were published with malice. The appellees contended that there is no cause of action because the articles were either protected by the neutral reporting privilege or privileged expressions of pure opinion.
The trial judge held that (1) the "letter to the editor" contained only expressions of pure opinion and, therefore, was privileged; (2) the "news story" was protected by the neutral reporting privilege, because the article was a disinterested report of a newsworthy event, which was simply a reprint of statements made by a police officer and Sadler; and (3) the "column" written by Doris Morgan was also a privileged expression of pure opinion, because the column contained a recitation of the facts upon which her opinions were based.
We affirm the trial court's determinations that the "letter to the editor" and the "news story" are not actionable for the reasons stated, but reverse with regard to the "column."
Whether alleged libelous statements are pure expressions of opinion or not is *1045 for the court to decide as a matter of law. From v. Tallahassee Democrat, Inc., 400 So.2d 52 (Fla. 1st DCA 1981). In this case the trial judge made a determination that no cause of action existed and dismissed the complaint with prejudice. The Smiths were refused an opportunity to amend their complaint, apparently because the trial judge believed that no matter how the complaint was amended it would not sustain a cause of action.
The complaint as directed against the "column" contained sufficient allegations to set forth a cause of action upon which relief can be afforded. The "column" complained of reads as follows:
 Around the Bend
 by Doris Morgan
 Barbs We Ignore, But Physical Violence
 Is Something Entirely Different
It is with regret that I feel compelled to write this week about the differences between the two newspapers which serve Taylor County ... regret because this competition, for the second time since the other newspaper was established in 1963, has been reduced to physical violence.
In last week's column I noted that we here at the News-Herald try to ignore the petty differences and accusations cast by our competitors across town. Following the article in Sunday's edition of that paper, we sternly decided that, even though we were upset by the insinuation that the News-Herald is giving away advertising ... an absolute untruth . .. we would again ignore the written barb.
Since early this year, we adopted the philosphy that we would not fuel the fire of the other newspaper's attempt to fight with any sort of reply.
We have committed ourselves to improving this newspaper, relying on our readers to judge for themselves.
But, there are exceptions to the rule ... some things can't be ignored.
Monday afternoon, at the request of Betsy Smith, Buddy Sadler hand-carried the original copy of a letter he wrote criticizing her newspaper last week. Incidentally, Sadler said he had mailed the copy, addressed to Ken Smith, in time for their paper to receive it for last Thursday's edition.
Sadler, the husband of News-Herald paste-up artist Melva Sadler, had copied the letter to me. He asked, after a recent half-page attack by the competitor, if he could write a letter. He knew of our philosophy about ignoring the threat but said he wanted to say something himself.
Mrs. Smith, as noted in her newspaper's article Sunday, had asked permission to see the original copy. I informed her in an "interview" which lasted the total of 90 seconds that I would tell Buddy and he could bring her the original.
Following the story, Buddy decided that he would carry his handwritten original to the Smiths. He did so Monday afternoon.
Sadler said when he was asked by Ken Smith why he wrote the letter, "I told him I wrote the letter because of the numerous articles in his paper criticizing the News-Herald and further, that I thought it was a waste of time and paper to print such criticism."
Smith apparently didn't like the answer. He ordered Sadler out of his office. At this point, according to Sadler, Smith apparently felt moved to stress his point. Sadler said that, when he reached the door, Smith struck him behind the head, propelling him onto the sidewalk.
Some unidentified woman was nearly knocked over as Sadler stumbled out the door. Sadler said when he turned around to face Smith and received a kick on the thigh, the woman turned, went to her vehicle and drove off.
Sadler then went to the courthouse, called in the authorities and filed a formal complaint charging Smith with assault.
Just how much good that will do is questionable. The only known witnesses to the event, according to Sadler, were *1046 Smith's employees and his wife. Sadler does not know the identity of the woman who left the scene.
It may be that Smith gets away with this absolutely uncalled-for action as he has managed to escape our replies to his barbs.
It may be that he tries other tactics against me Sadler and this newspaper in his continuing efforts to harass the News-Herald.
Knowing all these possibilities, however, I felt that this latest act of physical violence by Smith could not be ignored. The first incident came about in the mid-1960's when Smith assaulted then News-Herald Editor Bill Griffin over a similar disagreement.
Such conduct is appalling in a profession dedicated to the precept that the pen is mightier than the sword.
Most journalists abhor physical violence and try to prevent it by keeping the public informed of facts.
As I noted in the beginning, I regret the necessity for having to respond to Smith's actions. I regret it because I must search my own conscience to determine if I could have prevented the incident.
I could have refused to print the letter, I suppose. But then, I asked myself, why Sadler should be deprived of his right to an opinion simply because his wife is on the newspaper payroll.
I didn't encourage him. Neither did I discourage him.
Even so, I'm still not sure that I couldn't have prevented the Monday afternoon incident. But the knowledge that this isn't the first time Smith has become physically violent and knowing that Buddy was not seriously injured by the attack makes me feel less guilty.
Another consideration in the search of my conscience is the fact that I don't throw letters criticizing the News-Herald in the trash.
I have always felt that readers have the right to complain, and to have other readers know about their complaints.
I have never refused to print a letter criticizing the News-Herald as long as they conform to the basic rules; (1) being signed; (2) having no profanity or libel, and (3) being legible.
I feel I probably will receive at least one letter of reaction to this week's column ... and that will be printed, pro or con, as long as those rules are met.
At this point, I still have the feeling that I could have done something to prevent the incident. I'm not sure just exactly what, but something.
I can only assure Buddy, and others who might criticize the Smiths that I will do all I can to prevent the recurrence of such physical attacks. But, then, I don't know what that might be either.
I hope that I won't find it necessary to again dedicate this space to a response to Smith's innuendoes that News-Herald is falling apart ... last time I looked it was holding together pretty well ... or to the defense of some person who falls victim to an uncontrolled temper.
As I've said before, there are more important things to discuss, more important to the community than petty disagreements between competing newspapers. (emphasis supplied).
The circuit judge in his order found as follows pertaining to the column:
Likewise, the December 24, 1980 column by Doris Morgan is also a privileged expression of pure opinion. It is clear from reading the column that Mrs. Morgan is expressing her opinion about the incident between Kenneth Smith and Buddy Sadler. The column contains a recitation of the facts upon which her opinions are based. While Plaintiffs may not like what is written, the column is the type of commentary protected by Gertz and the cases that have followed.
It is clear, as the trial court determined, that a writer's opinion about a newsworthy item is a protected privilege. Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); 400 So.2d at 56. The Court in Gertz held:

*1047 Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact.
418 U.S. at 339, 340, 94 S.Ct. at 3007. However, it is not clear that the statements made by Doris Morgan in her column were mere expression of opinion.
Although pure expression of opinion is constitutionally protected, mixed expression of opinion is not. Pure expression of opinion exists when an article expressing an opinion is published and sets forth, in the article, the facts on which the opinion is based or when the parties to the communication are aware of the facts or assume their existence and the opinion is clearly based on those facts. Mixed expression of opinion exists when a published statement containing an opinion is made and is not based on facts set forth in the article, or assumed facts and, therefore, implies the existence of some other undisclosed facts on which the opinion is based. Restatement (Second) of Torts, § 566, pp. 171-173; 400 So.2d at 57.
In the complaint, appellants alleged that the "column" was published with actual malice and contained certain false defamatory statements. In From the court stated that in order to determine whether an allegedly defamatory statement is actionable it must be analyzed in terms of the test enunciated in Information Control Corp. v. Genesis One Computer Corp., 611 F.2d 781 (9th Cir.1980):
In sum, the test to be applied in determining whether an allegedly defamatory statement constitutes an actionable statement of fact requires that the court examine the statement in its totality in the context in which it was uttered or published. The court must consider all the words used, not merely a particular phrase or sentence. In addition, the court must give weight to cautionary terms used by the person publishing the statement. Finally, the court must consider all of the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published.
611 F.2d at 784; 400 So.2d at 57.
If the "column" had included only a reporting of what Sadler had said about the alleged physical confrontation with Smith and included opinion based on those facts, it would not have been actionable. However, in addition to reporting the incident pertaining to Sadler, the writer made certain factual assertions about an earlier incident without citing the source of the information. These included the items that we have underlined in the column.
The column contained more than a reporting of what Sadler alleged, or opinions based on those facts. The factual assertions regarding the 1963 incident changed the context of the article. The column no longer represented just the writer's opinions about Sadler's allegations. It was transformed into an attack against Smith, asserting that he was a violent person with violent tendencies. The history given in support of that proposition included both the incident involving Buddy Sadler and the earlier incident taking place in 1963 involving Bill Griffin, the then News-Herald Editor. The reader was provided with a gauge to measure the Sadler "facts," but not as to the 1963 incident. The 1963 incident was merely printed as fact without any cautionary terms or attributing it to any source.
The column is, therefore, not merely an expression of pure opinion. In alleging that the factual assertions set out in the column were made fraudulently and with malice and that the petitioner Kenneth Smith has been harmed as a result, appellants stated a cause of action upon which relief can be afforded. Therefore, Kenneth Smith should have been granted an opportunity to demonstrate that the factual assertions made in the article were false and defamatory as was alleged, as to the 1963 incident. A cause of action upon which relief may be granted has been stated *1048 whether Kenneth Smith is determined to be a private individual or a public figure.
The allegation that misstatements were made fraudulently and with malice sets forth a cause of action whether Kenneth Smith is a private individual or a public figure. Whether he is a public or private figure is a determination which has not yet been made at the trial level. Whether or not Kenneth Smith is a public or private figure, he will first have to prove that the written statements, as to the 1963 incident, are inaccurate. If he is a public figure, he will then be required to prove that the misstatements were made with actual malice. If he is a private figure, he would also be required to prove that the misstatements were the result of actual malice in order to recover punitive damages. However, if he is a private figure he could recover compensatory damages upon a showing of negligence. We reach these conclusions upon the following analysis of the case law.
The United States Supreme Court in New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), established a first amendment qualified privilege of fair comment, which protects defendants in defamation cases from suits by public officials. The privilege extends even to false statements of fact as long as they are not made with "actual malice." In order to recover damages a public official is required to prove that the defamatory statement was either published with knowledge that the statement was false or with reckless disregard of the truth.
The meaning of "reckless disregard of the truth" was clarified by the supreme court in St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), when it stated:
... reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice. 390 U.S. at 731, 88 S.Ct. at 1325.
The "actual malice" standard was subsequently extended to public figures in Curtis Publishing v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). The court found the New York Times rationale equally applicable to both public officials and public figures.
In Rosenbloom v. Metromedia, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), the emphasis in defamation cases briefly shifted away from the individual plaintiff and centered on the subject matter involved. The Supreme Court held that the "actual malice" standard applied to plaintiffs involved in matters of public or general concern regardless of their status as individuals.
Rosenbloom was overruled several years later by Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), which again focused attention on the plaintiff. The supreme court ruled that the New York Times "actual malice" standard was limited to public officials and public figures. The court held that a simple negligence standard applied in federal defamation suits brought by private individuals. However, in attempting to balance the competing interests of freedom of the press and the reputation of the individual, recovery by private individuals was limited to an amount necessary to compensate them for their actual injuries by requiring that the New York Times "actual malice" standard be met in order to recover punitive damages. 418 U.S. at 349, 350, 94 S.Ct. at 3011-3012; Helton v. United Press International, 303 So.2d 650 (Fla. 1st DCA 1974).
Although private individuals must only meet a negligence standard at the federal level, the Gertz court held that states can adopt any standard, with regard to private individuals, including requiring them to meet an "actual malice" standard, as long as it does not impose strict liability. 418 U.S. at 347, 94 S.Ct. at 3010.
*1049 The Gertz decision also defined the occasions when a plaintiff in a defamation suit would be subject to an "actual malice" standard as a public figure. The court held:
In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions.
418 U.S. at 351, 94 S.Ct. at 3013.
In order to become a limited public figure the individual must be involved in an actual public controversy. In addition, a limited public figure is subject to an "actual malice" standard only in those contexts where his participation in a controversy is sufficient to gain him general fame or notoriety in the community, and constitutes pervasive involvement in the affairs of society. 418 U.S. at 351, 94 S.Ct. at 3012-3013. See Time, Inc. v. Firestone, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976); Wolston v. Reader's Digest Association, 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979); Arnold v. Taco Properties, Inc., 427 So.2d 216 (Fla. 1st DCA 1983); J. Eaton, The American Law of Defamation Through Gertz v. Robert Welch, Inc., and Beyond: An Analytical Primer, 61 Va.L.Rev. 1349 (1975).
Until recently, it has not been altogether clear which constitutional standard a private individual must meet in a defamation suit in Florida, because the Florida Supreme Court has not had an opportunity to rule squarely on this point. However, the Third District Court of Appeal in Miami Herald Publishing Co. v. Ane, 423 So.2d 376 (Fla. 3d DCA 1982) in an opinion in which the pertinent law was discussed at length, held:
... in accord with established First Amendment law and the overwhelming weight of authority throughout the country, that under Florida law such a non-public figure plaintiff is not required under any circumstances to make such an "actual malice" showing as an element of his cause of action, it being sufficient if the plaintiff establishes, as here, that the defendant published the alleged false and defamatory statements with negligence [i.e., without reasonable care as to whether the alleged false and defamatory statements were actually true or false].
423 So.2d at 378. That determination was concurred in by this Court in Brown v. Tallahassee Democrat, Inc., 440 So.2d 588 (Fla. 1st DCA 1983). The Gertz negligence standard is, therefore, the law as to private individuals in defamation cases where compensatory damages are sought.
The order appealed from is REVERSED in part and REMANDED for proceedings consistent with this opinion.
WENTWORTH, J., concurs.
THOMPSON, J., dissents.
THOMPSON, Judge, dissenting.
I dissent. I would affirm the trial judge's dismissal of the libel complaint with prejudice.
Although the majority finds that one of the three allegedly libelous newspaper articles states a cause of action in libel, in my opinion none of them is a sufficient basis for a cause of action in libel. The article found sufficient by the majority is not libelous as a matter of law. If it is libelous then our local sports editor will have to stop writing about the "Gators" and our local food editor will have to cease rating restaurants.
The article which the majority finds is a sufficient basis for a cause of action expressed the writer's opinion about a newsworthy item and was a fully protected privileged opinion under Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). The language complained of in the article is no more libelous than that in From v. Tallahassee Democrat, Inc., 400 So.2d 52 (Fla. 1st DCA 1981), pet. for rev. den., 412 So.2d 465 (Fla. 1982), in which this court applied the Gertz standards and affirmed a dismissal *1050 with prejudice of the libel complaint even though the court found that From was not a public figure. Under the facts of this case, Smith is a public figure as a matter of law. He has made himself a public figure, similar to the editor in Gibson v. Maloney, 231 So.2d 823 (Fla. 1970), cert. den., 398 U.S. 951, 90 S.Ct. 1871, 26 L.Ed.2d 291 (1970), by virtue of his newspaper publishing activities and by his running battle with his local competition in the newspaper business. He is therefore subject to fair comment. In Gibson, the Supreme Court found that a local newspaper editor and publisher in Apalachicola, who engaged in an anti-duPont editoral policy for the purpose of arousing public indignation against duPont interests, made himself a public figure engaged in public enterprise. The court concluded he became a part of the passing scene and was therefore subject to fair comment. Gibson distributed copies of a speech in which he stated that the newspaper and its publisher, Maloney, took pleasure in berating and abusing any business interest in the community and that Maloney, in his frequent references to the Alfred I. duPont Estate and its various interests, not only vented his displeasure and venom but in some instances published outright falsehoods regarding the estate. In Gibson v. Maloney, 263 So.2d 632 (Fla. 1st DCA), cert. den., 268 So.2d 909 (Fla. 1972), cert. den., 410 U.S. 984, 93 S.Ct. 1505, 36 L.Ed.2d 180 (1973), this court found that the Supreme Court's decision that Maloney was a public figure was the law of the case and that the article complained of was not actionable libel as a matter of law. The case was remanded with instructions for the trial court to enter a judgment for Gibson. If accusing a newspaper and its editor of printing outright falsehoods is not libelous, then I do not see how the article complained of in this case can be actionable.
This case is similar in one major respect to the "ravioli case," D.C. v. State, 436 So.2d 203 (Fla. 1st DCA 1983). Although the "ravioli case" involved one child throwing ravioli at another, while this case involves older persons throwing a few words, neither case should be consuming the time of the very busy trial and appellate courts of our state. As stated in D.C. v. State, "[t]his case presents a perfect example of a disturbing societal proclivity towards settling all disputes through resort to a severely overburdened judicial system." 436 So.2d at 204.
As the majority quoted from Gertz: "However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." 418 U.S. at 339, 340, 94 S.Ct. at 3007 (footnote omitted). If anyone is capable of protecting their own interest in a minor controversy such as the one involved in this case, it should be the publisher and editor of a newspaper who has the full resources and power of the press at his disposal. If a newspaper can publish almost anything about a public figure with immunity, then surely at least the same immunity should attach to a statement made about the editor and publisher of a newspaper. Perhaps the appellant has chosen the wrong profession. If one cannot stand the heat he should not go into the kitchen and, more particularly, should not try to be chef.