461 So.2d 193 (1984)
Faye F. SEPMEIER, Charles William Sepmeier, and Fantasy Dancers, Inc., Appellants,
v.
TALLAHASSEE DEMOCRAT, Inc.; J. Carrol Dadisman, Publisher; Walker Lundy, Executive Editor; Bill Fuller, Managing Editor; Bill Mansfield, Editorial Page Editor; and Mary Ann Lindley, Columnist, Appellees.
No. AX-390.
District Court of Appeal of Florida, First District.
December 13, 1984.
Rehearing Denied January 8, 1985.
*194 C. Bette Wimbish, Tallahassee, for appellants.
C. Gary Williams and Michael J. Glazer of Ausley, McMullen, McGehee, Carothers & Proctor, Tallahassee, for appellees.
ZEHMER, Judge.
This is an appeal from a final order dismissing with prejudice a complaint alleging libel and service mark infringement. The trial court found the allegedly libelous statements privileged expressions of pure opinion. It also found no basis for a service mark infringement action. We affirm in part and reverse in part.
On May 20, 1983, The Tallahassee Democrat newspaper (Democrat) published a column[1] by Mary Ann Lindley, one of its *195 regular columnists. The column was headlined "Leathergrams: agony without the ecstasy" and dealt, in part, with the novelty message delivery service, Leathergram.
The next day, the Democrat published a letter to the editor[2] which it captioned "Customers offended." The letter expressed the author's "unfortunate pleasure" in watching a Leathergram performance and urged businesses not to allow such entertainment during business hours.
Fantasy Dancers, Inc., the corporation offering the Leathergram service, and its officers, Faye and Charles Sepmeier, filed suit on July 12, 1983, against the Democrat, its publisher, three of its editors, and Lindley. The complaint alleged the defendants libeled the plaintiffs by publication of the May 20, 1983, column and the May 21, 1983, letter to the editor. The complaint also alleged the use of the word Leathergram in the column unlawfully infringed upon Fantasy Dancers, Inc.'s registered service mark.
The Democrat filed a motion to dismiss the complaint. Following a hearing, the trial court issued a final order dismissing the complaint with prejudice.
Whether statements are privileged expressions of pure opinion or unprivileged mixed expressions of opinion is a question of law properly resolved by the trial court. Smith v. Taylor Publishing Co., Inc., 443 So.2d 1042 (Fla. 1st DCA 1983); From v. Tallahassee Democrat, Inc., 400 So.2d 52 (Fla. 1st DCA 1981). A privileged expression of pure opinion "occurs when the defendant makes a comment or opinion based on facts which are set forth in the article or which are otherwise known or available to the reader or listener as a member of the public." From v. Tallahassee Democrat, Inc., supra, at 57.
The plaintiffs contend that the article published by defendants is defamatory because it implies that the plaintiff Faye Sepmeier, the only messenger for Leathergram, performs a striptease act, nude or nearly nude, incident to delivering Leathergram messages. This fact is false, they say, because the messenger is fully clothed at all times. They take exception to the trial court's legal conclusion that the article, taken as a whole, is an expression of pure opinion and, thus, privileged.
In Smith v. Taylor County Publishing Co., Inc., supra, the court held the newspaper column there involved was not merely an expression of pure opinion. In reaching *196 that conclusion, the court reaffirmed the following rule:
Although pure expression of opinion is constitutionally protected, mixed expression of opinion is not. Pure expression of opinion exists when an article expressing an opinion is published and sets forth, in the article, the facts on which the opinion is based or when the parties to the communication are aware of the facts or assume their existence and the opinion is clearly based on those facts. Mixed expression of opinion exists when a published statement containing an opinion is made and is not based on facts set forth in the article, or assumed facts and, therefore, implies the existence of some other undisclosed facts on which the opinion is based.
Id. at 1047. The court reiterated the following test for determining whether an allegedly defamatory statement is actionable:
"In sum, the test to be applied in determining whether an allegedly defamatory statement constitutes an actionable statement of fact requires that the court examine the statement in its totality in the context in which it was uttered or published. The court must consider all the words used, not merely a particular phrase or sentence. In addition, the court must give weight to cautionary terms used by the person publishing the statement. Finally, the court must consider all of the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published."
Id. at 1047. See also, Madsen v. Buie, 454 So.2d 727 (Fla. 1st DCA 1984).
Applying the quoted rule and test, we are unable to conclude that the statements in the published article constitute pure expression of opinion, rather than mixed expression of opinion and fact, any more than the statements involved in Madsen v. Buie, supra. A statement that a person is clothed or is nude obviously constitutes a statement of fact, not opinion. A statement that a person removes his or her clothing to reveal the naked body in whole or in part is a statement of fact, not opinion. The article does not state that the Leathergram messenger is fully clothed; rather, it implies the contrary. The reference to a "lithe woman in Spandex, a dog collar, and black boots" is not the equivalent of a statement that the messenger is at all times fully clothed. Spandex is a fabric, not a garment, and it may be used in making garments to cover the entire body or virtually none of the body, depending on design and intent. Hence, the meaning of the quoted description must be determined in context with the immediately following paragraphs of the article describing the "Machogram version of the Leathergram" as a male messenger who, while gyrating to music, "shed everything but some very red bikini briefs." We can only conclude that the article equates Machogram and Leathergram as being essentially the same type presentation:
Removing his outfit piece by piece, the Machogram man in question revealed an underfed frame that did American manhood no great honor. And while I cannot speak for the male reaction to the Leathergram lady, the one I saw was no Nastassia Kinski.[3]
The article concludes with a reference to the appearance at the office of "a woman wearing whips and black boots," a statement also implying that the Leathergram messenger is, at best, scantily clothed. Moreover, the reference at the beginning of the article to "streaking," described as "a bunch of naked college men," with the comparison that "today's exhibitionist equivalent is the Leathergram," further reinforces an obvious implication of fact that the Leathergram messenger is nude or nearly so. Read in totality, the article strongly implies, as a predicate to the opinions *197 expressed, the material fact that the Leathergram messenger wears little, if any, clothing in the performance of her act.
Appellees have argued that all material facts upon which the columnist's opinion is based "are explicitly stated" in two sentences concerning the Leathergram episode with Governor Graham:
Even Gov. Bob Graham was (almost) rendered speechless a while back when a lithe woman in Spandex, a dog collar and black boots roared on stage at Capital Press Club skits at the civic center. I was sitting close to one of Graham's body guards, who lurched forward when she lashed her whip.
We respectfully disagree with this limited conception of the facts material to the opinion expressed because it fails to conform to the test from Smith that "the court must consider all the words used, not merely a particular phrase or sentence" (443 So.2d at 1047).
We have no quarrel with the right of this columnist to compare the Leathergram with "streaking" and Machogram for the purpose of expressing a personal opinion that the messenger presentations described are not worth the cost of fifty dollars and are as socially unacceptable, if not downright reprehensible, as "streaking." If the essential facts forming the predicate for this comparison and opinion had been fully, fairly, and truthfully stated, the comparison would constitute a privileged expression of pure opinion. But such was not the case here. This columnist compared "streaking" (described as "pure nakedness"), Machogram (a striptease down to near nakedness  "red bikini"), and Leathergram (unstated state of nakedness  "a lithe woman in Spandex, dog collar and black boots") and thereby made the Leathergram messenger's state of dress a material fact underlying the comparison being drawn as a basis for the pure opinion being expressed. Having done so, the article did not explain that there was any material difference between the dress of the Leathergram messenger and Machogram messengers or "streakers," but necessarily left the Leathergram messenger's state of dress to implication from the descriptions being compared. It necessarily follows that the article constituted mixed expression of opinion under the rule in Smith that "mixed expression of opinion exists when a published statement containing an opinion is made and is not based on facts set forth in the article," but "implies the existence of some other undisclosed facts on which the opinion is based" (443 So.2d at 1047). We venture no opinion on whether plaintiffs should ultimately prevail in this action before a jury; we conclude only that plaintiffs should have a chance to convince them.
It is difficult to understand the plaintiffs' argument concerning the May 21, 1983, letter to the editor. The plaintiffs do not contend on appeal that the letter or its caption is defamatory. They argue instead that publication of the letter the day after publication of the column was somehow defamatory. We disagree and reject this argument for the obvious reason that publication of nondefamatory statements does not provide the basis for a defamation cause of action.
Finally, we uphold the dismissal of the plaintiffs' service mark infringement action. The plaintiffs contend the use of the word Leathergram in the column constituted infringement pursuant to section 495.131, Florida Statutes (1983). Section 495.131(1) infringement requires that the use of the service mark be "likely to cause confusion or mistake or to deceive as to the source or origin of [the alleged infringer's] goods or services." Section 495.131(2) infringement requires application of the service mark to "labels, signs, prints, packages, wrappers, receptacles or advertisements." Even if use of the word Leathergram in the column was a use of a registered service mark  and we are not convinced it was  the use met neither of the above-mentioned statutory requirements for infringement.
That portion of the judgment dismissing the cause of action for defamation based on the publication of the letter to the editor *198 and the cause of action for service mark infringement is affirmed. The dismissal of the defamation action based on libelous statements in the published column is reversed, and the case is remanded for further proceedings thereon.
AFFIRMED in part and REVERSED in part.
ERVIN, C.J., concurs.
MILLS, J., concurs in part and dissents in part.
MILLS, Judge, concurring in part and dissenting in part.
I agree with the majority that the trial court's dismissal of plaintiffs' action for defamation based on the publication of the letter to the editor and their action for service mark infringement should be affirmed. I do not agree with the majority that the trial court's dismissal of plaintiff's action based on libelous statements in the published column should be reversed. I would affirm.
The column fairly read as a whole neither states nor implies the existence of undisclosed facts that the Leathergram messenger performs in the nude or performs a striptease.
The opinions expressed in the column, although critical of the Leathergram service, are based on facts set forth in the column. The facts are explicitly stated as follows:
Even Gov. Bob Graham was (almost) rendered speechless a while back when a lithe woman in Spandex, a dog collar and black boots roared on stage at Capital Press Club skits at the civic center. I was sitting close to one of Graham's body guards, who lurched forward when she lashed her whip.
The trial court correctly ruled the column privileged expression of pure opinion. See Smith v. Taylor County Publishing Company, Inc., 443 So.2d 1042 (Fla. 1st DCA 1983); From v. Tallahassee Democrat, Inc., 400 So.2d 52 (Fla. 1st DCA 1981); and Information Control v. Genesis One Computer Corp., 611 F.2d 781 (9th Cir.1980).
NOTES
[1] The column is reprinted below in its entirety:

Leathergrams: agony without the ecstasy
Streaking turned out to be, as one headline writer of the era predicted, "just another passing fanny."
Some say streaking started on the Florida State University Campus, a post-sexual-revolution springtime rite. Others say it originated at the University of Maryland but never caught on because it gets too cold there.
Wherever it started, streaking was hot for a while during March 1974. Spectators would gather almost nightly on Landis Green to witness the sensation that was putting FSU on the map  before the football team did. With the anticipation of those who look for leprechauns in the grass, they hoped to glimpse these Panlike figures whisk across the Green.
What they got instead was a bunch of naked college men  with more courage than assets  climbing flagpoles, drinking beer and just hanging around. Then-Sheriff Raymond Hamlin was about the only one to take streaking very seriously, and except for the one fellow with an Indian headdress and maracas, the whole business lost its charm when it lost its spontaneity.
But at least streaking was free.
Today's exhibitionistic equivalent is the Leathergram, and it will run you about $50 a shot.
I would like to reveal that I, for one, don't find these shows very sexy. No, let me go further. I find them excruciating.
Even Gov. Bob Graham was (almost) rendered speechless a while back when a lithe woman in Spandex, a dog collar and black boots roared on stage at Capital Press Club skits at the civic center. I was sitting close to one of Graham's bodyguards, who lurched forward when she lashed her whip. Alas, it never got any better than that.
Recently an editor was working her last day at the Democrat when the Machogram version of the Leathergram zoomed into the newsroom to bid her farewell. This pale, thin male in a cowboy outfit put his ghetto blaster on the floor by her desk, turned up the music and began to gyrate. While the bored hordes looked on, he shed everything but some very red bikini briefs.
Admittedly, it is worth a lot to hear a woman alternately shriek "Oh, no. Oh, no" and "I don't believe this." And, yes, it is worth something to be able to say for months on end: "You should've seen the look on her face."
But it is not worth $50.
For one thing, the show itself is interminable. Long after your grin muscles are aching with lactic-acid buildup, long after the wisecracks have waned and the puns begun to pale, these O-gram people dance on.
Removing his outfit piece by piece, the Machogram man in question revealed an underfed frame that did American manhood no great honor. And while I cannot speak for the male reaction to the Leathergram lady, the one I saw was no Nastassia Kinski.
But maybe that's what keeps the Leathergram business in business: The sanctity of sex is never in jeopardy. A business executive could go home at night and say to his wife, "Hi, dear. Guess what? A woman wearing whips and black boots came to the office today." And her response would be, "That's nice. Did you pick up the laundry on your way home?"
[2] The letter is reprinted below in its entirety:

Customers offended
Last week I took my teen-age son for a hair cut at a local styling salon. We had the unfortunate pleasure of having to sit though a "leathergram."
This letter is not being written to hurt the business or to degrade a young person who thinks she needs to make a living in this manner.
I am writing to local business owners and managers. As a paying customer, my request is simple. Please do not allow this type of entertainment during business hours. Or at least tell your clients about the upcoming event.
While the "act" was going on, I took a good look at the people around me. A 65-year-old woman became teary-eyed and her mouth began to quiver. It was as if she could hardly believe what she saw. Also a little boy, about 3 years old, told his mother he did not like the lady dancing and didn't want to watch. For them and for people like them, I write my letter.
To be invited to a private home or to a business before or after hours for such entertainment, at least gives an individual a choice. Business owners and managers, think about your customers. They are the ones who keep you in business.
ELLEN DAVIS
[3] The purpose of this reference is not entirely clear. Nastassia Kinski is a movie star of some reknown and has starred in at least one "R" rated movie described in a recent cable television guide as involving nude scenes.