468 So.2d 512 (1985)
Arlene C. HUSZAR, Appellant,
v.
Michael A. GROSS, Martin R. Drummond, and the Gainesville Sun, Appellees.
No. AZ-63.
District Court of Appeal of Florida, First District.
May 13, 1985.
*513 Kenneth S. Davis, Gainesville, for appellant.
S. Craig Kiser and Walter W. Wood, Tallahassee, Dan Paul and Steven M. Kamp of Paul & Burt, Miami, for appellees.
MILLS, Judge.
Huszar appeals from an amended final judgment dismissing with prejudice her first amended complaint charging Gross, The Gainesville Sun and Drummond with libel. Huszar contends the trial court erred in dismissing Gross on the ground of absolute privilege and erred in dismissing The Sun and Drummond on the ground of privilege as accurate and neutral reporting and as accurate reporting of an official action. We disagree and affirm.
*514 Gross was the Director of the Division of Securities in the Office of the Comptroller of the State of Florida. Drummond was the reporter with the Gainesville Sun who wrote the alleged libelous article. The article, "Squabble Over Legal Fees Stalls Rabbit Breeder Case," is an account of the legal proceedings between the Comptroller and one of Huszar's clients, John N. Adams, III. It is quoted in full:
Squabble Over Legal Fees
Stalls Rabbit Breeder Case
By Martin R. Drummond
Sun Staff Writer
High Springs  A Gainesville attorney has been accused of delaying settlement of a lengthy legal battle between the state Comptroller's office and her client, a High Springs rabbit breeder.
The attorney, Arlene Huszar, said her legal fees haven't been paid and she won't send a signed compromise agreement to Comptroller Gerald Lewis until the breeder, John N. Adams III, pays her.
That refusal has been labeled as "unethical" by comptroller's office legal adviser Michael Gross who said Huszar was "holding up the wheels of justice."
Mrs. Huszar told The Sun Adams owes her more than $1,000 for legal advice she's given him since Lewis filed suit in March. The suit charged Adams with attempting to defraud investors with claims that up to $28,000 could be earned every six weeks by persons who follow the Regency breeding plan.
The agreement, which is still not part of court records, allows Adams and his firm, Regency International Inc., to retain the marketing plan which offers an investment package of 14 breeding rabbits for $7,200 as long as he registers the plan with the state Division of Securities.
Prepared by the state, the compromise document was signed more than two months ago and has been held in Huszar's office since.
She said Adams has promised her payment in two to three weeks, though she admitted she had no guarantee of being paid.
Gross said his office is tired of being delayed by the problems between Huszar and Adams.
"She has to decide to represent him with or without a fee, or to withdraw from the case," he said.
Gross said if Huszar continues to withhold the document from state officials because of Adams' non-payment, she could face legal action herself from the comptroller's office to make her hand over the agreement.
"We are taking steps now to force her to take a position," he said.
Among the allegations listed in the March lawsuit against Adams and Regency were that investors were being misled about the value of a breeding package of which the lawsuit said worth only about $1,000, not the $7,200 Adams is charging.
The rabbits are still being sold at Regency's warehouse location in High Springs.
Part of Adams' marketing plan mentioned that negotiations were taking place with the owners of the old Copeland Sausage plant in Alachua to accommodate the meat and pelt processing required for the 30,000 rabbits he says local Rex breeders will produce next year.
Adams said the plant will manufacture about 1,000 rabbit fur coats a month.
"Of course, the plant will accommodate a much greater capacity; one which will have tremendous impact on the world fur market," he said.
A spokesman for Riviana Foods, the plant's owner, said, however, that Adams has not talked with the Texas firm about purchasing the meat-processing facility "for at least a couple of months."
"As far as we're concerned, the negotiations have been dropped," said Riviana spokesman Wayne Ray.
Adams was also charged with marketing an unregistered security because his firm would offer to buy back any rabbit *515 or rabbit pelt, should the investor change his mind.
Part of the compromise agreement requires Adams to provide the comptroller's office with proof that each Rex rabbit investor has been given a chance to sell back to Regency each rabbit at the full purchase price.
Gross said Adams has not complied with that requirement.
As the article indicates, Huszar's client was sued by the comptroller for attempting to defraud investors in connection with a rabbit-breeding scheme. The article reported Huszar's position, based on an interview with her, as follows:
1. [H]er legal fees haven't been paid and she won't send a compromise agreement to Comptroller Gerald Lewis until the breeder, John N. Adams, III, pays her.
2. Adams owes her more than $1,000 for legal advice she's given him since Lewis filed suit in March.
3. Adams has promised her payment in two to three weeks, though she admitted she had no guarantee of being paid.
In the complaint, Huszar does not dispute the fact that these statements were correctly attributed to her, but rather claims she was libeled when The Gainesville Sun reported the following remarks made by Gross:
1. Huszar's refusal to send the signed compromise agreement to the comptroller until such time as her client agreed to pay her fees was "unethical" and holding up the wheels of justice.
2. Huszar's continued withholding of the signed compromise agreement could result in legal action against her by the comptroller's office.
3. The Comptroller's office is "taking steps now to force her to take a position."
Count I of Huszar's complaint alleges that Gross's statements were defamatory, false, and made with malicious intent. Counts II and III, relating to Drummond and The Gainesville Sun, allege that the article was written with knowledge of its falsity and defamatory nature. In the Amended Final Judgment, the trial court dismissed with prejudice the first amended complaint on the following grounds:
1. Gross, as a member of the executive branch, was immune from liability because his statements were made in the course and scope of his employment and, thus, absolutely privileged.
2. The article was a fair and accurate report of Gross' official statements and of a judicial proceeding. Such neutral reportage is protected by the First Amendment.
3. The article was a fair and accurate report of an official action, a lawsuit initiated by the comptroller against one of Huszar's clients.
In McNayr v. Kelly, 184 So.2d 428 (Fla. 1966), the Florida Supreme Court extended to executive officials an absolute privilege as to defamatory publications made in connection with the performance of their official duties and responsibilities.
Huszar argues that the trial court did not have sufficient allegations in front of it to make a determination that this privilege applied because it was not established that Gross was acting in his official capacity when he made the statements in question concerning Huszar.
However, based on the general rule that upon a motion to dismiss, the trial court must accept as true all well pleaded facts as well as all reasonable inferences arising therefrom, it appears that the trial court was justified in concluding that Gross was acting in the course and scope of his employment. Kirvin v. Clark, 396 So.2d 1203 (Fla. 1st DCA 1981). Further, as was stated in Danford v. City of Rockledge, 387 So.2d 967 (Fla. 5th DCA 1980), the Florida Supreme Court has adopted a broad definition of the phrase "scope of office."
It is Huszar's contention that the neutral reporting privilege cannot be properly asserted in a motion to dismiss because it requires factual determinations to be made. However, it is well established *516 that when the facts and circumstances of a communication are revealed, the issue of whether a privilege has been established is a question of law for the court to decide. Abraham v. Baldwin, 52 Fla. 151, 42 So. 591 (1906).
Moreover, the numerous cases cited by the parties confirm the fact that trial courts, upon motions to dismiss, routinely make decisions as to whether a privilege applies to protect an allegedly defamatory statement. Some examples are Sepmeier v. Tallahassee Democrat, Inc., 461 So.2d 193 (Fla. 1st DCA 1984); Smith v. Taylor County Publishing Company, Inc., 443 So.2d 1042 (Fla. 1st DCA 1983); From v. Tallahassee Democrat, Inc., 400 So.2d 52 (Fla. 1st DCA 1981); Kribs v. City of Boynton Beach, 372 So.2d 195 (Fla. 4th DCA 1979); Hauser v. Urchisin, 231 So.2d 6 (Fla. 1970).
A reading of the article in question indicates it to be the type of disinterested and neutral reporting that the First Amendment privilege is designed to protect.
The trial court found the article to be the reporting of an official action, the lawsuit between Huszar's client and the Comptroller. As stated in the Restatement of Torts (Second), Section 611:
The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgment of the occurrence reported.
In addition, in Florida there is a qualified privilege to make reports of judicial and quasi-judicial proceedings as long as they are accurate, fair and impartial. This privilege extends to protect the remarks of counsel as well. 19 Fla.Jur. Defamation and Privacy, § 71 (1980).
The newspaper article was a report on the status of a lawsuit filed by the Comptroller against Huszar's client, an official action of public interest, including the remarks of Gross, a government attorney involved, relating to the prosecution and possible further action by the Comptroller's office.
AFFIRMED.
NIMMONS, J., and PEARSON, TILLMAN (Ret.), Associate Judge, concur.