NATIONAL ARTISTS MANAGEMENT COMPANY, INC. and Kolmar Luth Booking Company, Inc. d/b/a Namco Booking, an unincorporated division of National Artists Management Company, Inc., Plaintiffs,

v.

Susan WEAVING and Richard Martini, Defendants.

No. 91 Civ. 1501 (KC).

United States District Court, S.D. New York.

May 9, 1991.

Gerald Singleton, Frankfurt, Garbus, Klein & Selz, Jay Goldberg, New York City, for plaintiff Nat. Artists Management Co., Inc.

Judd Burstein, Judd Burstein, P.C., New York City, for plaintiff Kolmar Luth Booking Co., Inc.

Brian E. Maas, Beldock Levine & Hoffman, New York City, for defendant Susan Weaving.

Daniel J. Kornstein, Kornstein Veisz & Wexler, New York City, for defendant Richard Martini.

## MEMORANDUM AND ORDER

CONBOY, District Judge:

Through its unincorporated division known as NAMCO Booking, plaintiff National Artists Management Company, Inc. ("NAMCO") is engaged in the business of representing and booking in-house talent and productions and independent theatrical productions throughout the United States. In the last five years, under the direction of its former president, defendant Susan Weaving, NAMCO Booking has become one of the premiere booking agencies in the United States. NAMCO's roster of theatrical Broadway and Broadway-bound productions has included "Phantom of the Opera", "The Piano Lesson", "The Magic of David Copperfield", "South Pacific", "A Chorus Line", Penn & Teller, the Moscow Circus, "The Flying Karamazov Brothers", and "Fiddler on the Roof".

On January 30, 1991, with eleven months remaining on the term of her employment contract with NAMCO, Weaving terminated her employment with NAMCO and refused to return to work. Since Weaving's departure, NAMCO has lost several of its customers and clients, including "A Chorus Line", Penn & Teller, "The Flying Karamazov Brothers", the Moscow Circus, and "The Piano Lesson," accounting for a substantial portion of NAMCO's booking revenues. NAMCO fears further losses and damage to its reputation and goodwill. According to NAMCO, Weaving's departure followed upon the heels of disputes between Weaving and NAMCO's principals, including Barry and Fran Weissler, the sole shareholders of NAMCO, and Brad Krassner and Joe Marsh, about plans for future expansions and operating procedures at NAMCO. Affidavit of Barry Weissler, sworn to on March 1, 1991 ("Weissler Aff."), ¶¶ 46–50. Weaving, on the other hand, has advised NAMCO and others that she was forced to terminate her relationship with NAMCO because of certain illegal and improper business practices engaged in by certain of NAMCO's principals. Affidavit of Susan Weaving, sworn to on March 6, 1991 ("SW Aff."), ¶ 2.

In February 1991, Weaving's husband, Richard Martini, one of three producers of "A Chorus Line", terminated his show's booking arrangement with NAMCO. He has told presenters and promoters in the theatre industry that he and his fellow producers of "A Chorus Line" terminated their use of NAMCO because "we didn't think we were going to be adequately represented." Deposition of Richard Martini, taken on March 6, 1991 ("RM Dep."), at 80–81. In addition, he has told NAMCO customers that there "were certain improprieties by the [NAMCO] partners." *Id.* at 42.

In this action, NAMCO seeks to enjoin Weaving from establishing and engaging in any business competing with NAMCO during the unexpired term of her exclusive employment agreement with NAMCO Booking, which she has allegedly wrongfully repudiated. NAMCO also seeks enforcement of certain specific restrictive covenants and noncompete provisions in Weaving's employment agreement. In addition, NAMCO seeks to enforce restrictive covenants and noncompete provisions in an asset acquisition agreement signed by Martini when NAMCO acquired Kolmar–Luth Entertainment, Inc., a theatre booking company of which Martini was formerly president and major shareholder. Finally, NAMCO seeks to enjoin Weaving and Martini both from making false and disparaging statements about plaintiffs concerning the alleged improprieties that assertedly forced Weaving to leave NAMCO, and from soliciting plaintiffs' clients.

This action was filed on March 1, 1991. That same day, plaintiffs moved for a temporary restraining order and preliminary injunction. At a conference held that day, defendant Weaving agreed voluntarily to "not, directly or indirectly, solicit any business from, deal with or have any contact with any customers or clients of plaintiff as of January 30, 1991, until the conclusion of the preliminary injunction proceedings." Order dated March 1, 1991. Because these restrictions, according to Weaving, were unduly broad in that they prevented her from having social contact with friends who are also customers or clients of NAMCO, Weaving asked that the restrictions be modified. Accordingly, at the conclusion of the March 11, 1991, hearing, the voluntary

restrictions on Weaving's conduct were limited, upon consent of the parties, to prevent Weaving only from "talk[ing] about NAMCO" and "talk[ing] about setting up her own business" until the conclusion of the preliminary injunction proceedings. Tr. 167.[1]

The Court's sole concern at this stage of the litigation is subject matter jurisdiction. Plaintiffs initially pleaded only diversity jurisdiction, stating claims for, *inter alia,* breach of contract, breach of fiduciary duty, tortious interference with contract, and conversion of trade secrets. Plaintiffs alleged that plaintiff NAMCO is a New Jersey corporation with its principal place of business in New York, and that plaintiff Kolmar Luth Booking Company, Inc. ("K–L") is a wholly owned subsidiary of NAMCO, organized and existing under the laws of New York, with its principal place of business in New York. Complaint ¶¶ 1–2. As to defendants Weaving and Martini, plaintiffs alleged that they are citizens of the State of Connecticut who maintain a separate residence in New York City.

After defendants challenged diversity jurisdiction, contending that defendants are citizens of the State of New York, plaintiffs filed an amended complaint on March 8, 1991, adding a claim for unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Amended Complaint ¶¶ 39–48. Plaintiffs thus allege that federal question jurisdiction exists pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1338. Defendants have challenged this basis of jurisdiction as well, arguing that plaintiffs have failed to state a claim for unfair competition under the Lanham Act.

On March 11, 1991, the Court held a hearing on the diversity jurisdiction issue. The Court also received further briefing, and held oral argument on March 22, 1991, on the question of Lanham Act jurisdiction.

### I. *Diversity Jurisdiction*

█ Defendants allege that, although they maintain a secondary residence in Connecticut, they are citizens of New York, and that therefore diversity jurisdiction

does not exist. For purposes of diversity jurisdiction, a natural person's citizenship is determined by domicile. Although a person may have more than one residence, she may only have one domicile at any one time. *Williamson v. Osenton,* 232 U.S. 619, 34 S.Ct. 442, 58 L.Ed. 758 (1914). Domicile requires (1) the party's physical presence in the state; (2) the intent to remain in that state indefinitely. *See, e.g., Mississippi Band of Choctaw Indians v. Holyfield,* 490 U.S. 30, 109 S.Ct. 1597, 1608, 104 L.Ed.2d 29 (1989). The second element does not require that the person have an affirmative intent to remain permanently in the state, merely that she has no present intent to move to another state. There is no minimum period of residence necessary to establish domicile.

Domicile has been defined generally as a person's "home" or permanent base of operations. "[H]ome is the place where a person dwells and which is the center of his domestic, social and civil life." Restatement of Conflicts 2d §§ 11, 12 (1971) (quoted in 1 J. Moore, J. Lucas, et al., *Moore's Federal Practice* ¶ 0.74[3.–3] at 707.65 n. 21 (2d ed. 1991) (hereinafter *"Moore's Federal Practice"*). The "[d]omicile of a person is the place where he has his true, fixed home and principal establishment, and to which, whenever he is absent, he has the intention of returning. Domicile therefore, has both a physical and a mental dimension and is more than an individual's residence, although the two typically coincide." 13B C. Wright & A. Miller, *Federal Practice and Procedure* § 3612 at 526–27 (1984).

█ Where, as here, there is evidence indicating the party has more than one residence, or the residence is unclear, the court should focus on the intent of the party. *Brignoli v. Balch, Hardy & Scheinman, Inc.,* 696 F.Supp. 37, 41 (S.D.N.Y.1988). "To ascertain intent, a court must 'examine the entire course of a person's conduct in order to draw the necessary inferences as to the relevant intent.'" *Id.* "In ascertaining the intent of the party, that party's entire course of conduct may be taken into account. The

---

**1.** "Tr. ——" indicates a reference to the March 11, 1991 hearing.

party's own statements concerning his intentions are relevant, but they are of slight weight when they come into conflict with other facts that tend to disclose a contrary intent." *Bevilaqua v. Bernstein*, 642 F.Supp. 1072, 1074 (S.D.N.Y.1986) (Weinfeld, J.). "Although intent is crucial to domicile, mere subjective statements of affiliation with a particular state or of an intent to make it one's home, of course cannot suffice for a finding of state citizenship if such statements are belied by objective indicia of actual residence and intent." *Willis v. Westin Hotel Co.*, 651 F.Supp. 598, 601 (S.D.N.Y.1986).

A "totality of the evidence" approach is called for, and no single factor is conclusive, although the residence of a married person's spouse and children (if the couple has not separated) is given considerable weight. "Among the influential factors are the place where civil and political rights are exercised, taxes paid, real and personal property (such as furniture and automobiles) located, driver's and other licenses obtained, bank accounts maintained, location of club and church membership and places of business or employment." 1 *Moore's Federal Practice* ¶ 0.74[3–3] at 707.64. Courts have also listed other factors as relevant, including whether the person owns or rents his place of residence, the nature of the residence (i.e., how permanent the living arrangement appears), affiliations with social organizations, and the location of a person's physician, lawyer, accountant, dentist, stockbroker, etc. *See, e.g., Brignoli* 696 F.Supp. at 41; *Willis* 651 F.Supp. at 600.

The determination of domicile is a mixed question of law and fact, and the district court may gather the evidence necessary to make a determination either by live testimony or by deposition and affidavit; the determination is one made by the court. *See Katz v. Goodyear Tire and Rubber Co.*, 737 F.2d 238, 742 n. 2 (2d Cir.1984) (the question of jurisdiction need not be submitted to a jury) (citations omit-

ted). The party seeking to invoke federal jurisdiction has the burden of proving that diversity exists; here plaintiffs have the burden of proving that Weaving and Martini are domiciled in Connecticut.

A person is born with a particular domicile, and is presumed to retain it unless it can be shown that she has established a new domicile. That rule applies every time a person establishes a domicile. Where a party has established a domicile, therefore, the burden for demonstrating that a new domicile has been established lies with the person seeking to establish the change. *E.g., Bevilaqua*, 642 F.Supp. at 1073 ("[o]nce domicile is established in one state, it is presumed to continue in existence, even if the party leaves that state, until the adoption of a new domicile is proven"); *Brignoli*, 696 F.Supp. at 41; *Willis*, 651 F.Supp. at 603.

Plaintiffs rely heavily on the fact that Weaving and Martini own a house in Roxbury, Connecticut, which was purchased in 1979 (8 years before they purchased their New York City co-operative apartment), where they held their wedding reception after their 1981 marriage at the "family's parish church" in Connecticut (SW Aff. ¶ 5), and where Weaving has spent most of her time since leaving NAMCO (Tr. 51). In addition, plaintiffs point to defendants' Connecticut telephone bills, which totalled $135.87 for December 1990 and $217.20 for January 1991 (RM Aff., Ex. B),[2] indicating that many phone calls are made from the Connecticut home. They also receive business calls at that home, where there is a fax machine. (Tr. 45, 52) Both Weaving and Martini are registered to vote in Connecticut. (RM Aff. ¶ 18, SW Aff. ¶ 9) Weaving has let her New York State driver's license expire, and has obtained a Connecticut driver's license. (SW Aff. ¶ 9) Weaving's personal physician is located in Connecticut. (SW Aff. ¶ 8) Plaintiff's argue that these facts indicate at least Weaving's intention, if not Martini's, of making Connecticut her home.

---

**2.** "RM Aff. ——" indicates a reference to the Affidavit of Richard Martini, sworn to on March 6, 1991.

Despite these connections with Connecticut, the affidavits submitted by Susan Weaving and Richard Martini and the testimony presented at the hearing on March 11, 1991, leave little doubt that Weaving and Martini are New York domiciliaries. Both have lived and worked in Manhattan since 1976 (RM Aff. ¶ 7, SW Aff. ¶¶ 4,8), residing in a series of rental apartments before purchasing their cooperative apartment at 201 East 37th Street in New York City, where they have lived since 1987. (RM Aff. ¶ 7, SW Aff. ¶ 8) Both work in New York and spend the bulk of their time in New York, going to their Connecticut home approximately two weekends per month. (RM Aff. ¶¶ 8–9, 15, SW Aff. ¶ 6) They receive mail, including paychecks and personal bills, at their New York address. (RM Aff. ¶ 12, SW Aff. ¶ 8) In addition, they make the two-hour trip to their Connecticut house, which has no closets (Tr. 44), only on weekends. (RM Aff. ¶ 15, SW Aff. ¶ 6)

It is clear that Weaving and Martini's Connecticut home is solely a weekend home. Further, even if that conclusion were not so clear, Weaving and Martini have established that they were domiciled in New York City in 1976, before the Roxbury house was purchased, and plaintiffs have failed to establish that their domicile has since changed to Connecticut. Given that Weaving is from Connecticut and that her family still lives there, it is not surprising or significant that she had her wedding and reception in Connecticut. (SW Aff. ¶ 6) As to voting in Connecticut, both Weaving and Martini have testified that they very rarely vote, and that they are simply more interested in local issues in Roxbury, particularly zoning issues. (Tr. 48, RM Aff. ¶ 18) Finally, Weaving's other doctors, including her dentist and gynecologist, are located in Manhattan. (SW Aff. ¶ 8) Defendants have therefore not overcome the presumption that Weaving and Martini, since becoming New York domiciliaries in the late 1970's, continue to make New York their home.

We conclude, based on the totality of the evidence, that Weaving and Martini are domiciled in New York. Because one of the plaintiffs is a New York corporation, the Court does not have diversity jurisdiction over this action.

## II. *Federal Question Jurisdiction*

At the heart of the dispute between NAMCO and the defendants is NAMCO's claim that Weaving has breached her exclusive employment agreement with NAMCO. Nevertheless, as we have noted, plaintiffs filed an amended complaint in this action adding a claim against Weaving and Martini for unfair competition under Section 43(a) of the Lanham Trademark Act, 15 U.S.C. § 1125(a) (1988). Plaintiffs allege that Martini and Weaving have made false or misleading representations of fact concerning NAMCO Booking's services and commercial activities for the purpose of promoting a competing theatrical booking business to be formed by Weaving and to be called "Tour de Force".

 Section 43(a) of the Lanham Act was amended in 1988 to reach false statements made by a defendant not only about the defendant's own products or services, but also about the plaintiff's products or services, in the context of commercial advertising or promotion used in connection with goods or services. *See* Trademark Law Revision Act of 1988, Pub.L. No. 100–667, Section 132, 102 Stat. 3935, 3946 (effective November 16, 1989). Section 43(a) now provides, in relevant part:

> Any person who, on or in connection with any goods or services, ... uses in commerce any ... false or misleading description of fact, or false or misleading representation of fact, which—
>
> (2) in commercial advertising or promotion, misrepresents the nature, characteristics [or] qualities ... of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Section 43(a), 15 U.S.C. § 1125(a) (1988). "In essence, the 1989 amendments expand the Act to include commercial defamation claims.... The 1989 amendments extend the reach of the Act to any false and misleading representations about the 'nature,

characteristics, qualities or geographic origin of [any person's] goods, services or commercial activities.'" *Monoflo Int'l, Inc. v. Sahm*, 726 F.Supp. 121, 126 n. 10 (E.D.Va.1989).

■ To establish an unfair competition claim under Section 43(a)(2), plaintiffs in this action must demonstrate the following: (1) that defendants made false or misleading factual representations of the nature, characteristics, or qualities of plaintiffs' services; (2) that defendants used the false or misleading representations "in commerce", on or in connection with any services; (3) that defendants made the false or misleading representations in the context of commercial advertising or commercial promotion; and (4) that defendants' actions made plaintiffs believe that they were likely to be damaged by such false or misleading factual representations.

■ As to the first element, plaintiffs allege that Weaving and Martini have made false or misleading factual representations about the nature, characteristics, and qualities of NAMCO's services. At the March 11 hearing, Weaving testified that she had been "telling customers of NAMCO that [she] was forced to leave because of improprieties [at NAMCO]." Tr. 61. In all, Weaving spoke to about twenty people. Tr. 72. Ten were then NAMCO clients (performers, artists, and producers of shows), the rest were some of the customers (people who buy shows from NAMCO and present them in a local market) she has dealt with over the last fifteen years. Tr. 73. NAMCO has "around 30, maybe 30–plus clients." Tr. 76. "All the people [she spoke to] had connection with NAMCO as buyers and customers." Tr. 76.

"[O]n certain occasions in different conversations", Weaving "advised producers of theatrical productions represented by NAMCO and presenters of such productions that Joe [Marsh] and Brad [Krassner] were stealing on dates sold by the agency." Tr. 67. Weaving had this conversation with Al Nocciolino, a co-producer (with Martini and Bob Young) of "A Chorus Line" (SW Dep. 75) [3]; Bob Young (SW Dep. 94–95); John Ballard, one of the producers of the Red Army Chorus and a promoter on a number of "A Chorus Line" dates (SW Dep. 83); Tim DeBaets, a friend and lawyer for the Flying Karamazov Brothers (SW Dep. 89); and Vicki Traube, a close friend and lawyer at International Creative Management ("ICM") (SW Dep. 93–94). "In rare instances, when [she] discussed details with people who had intimate knowledge of how [her employment with NAMCO] ended, like Alan Spivak," Tr. 67, a producer of "Phantom of the Opera" who tried to settle the differences between her and NAMCO, Weaving added that "Barry and Fran [Weissler] were not helping to stop" Marsh and Krassner's improper, unethical, and possibly illegal conduct. Tr. 67.

Other people with whom Weaving spoke, she "advis[ed] ... generally without regard to specific incidents that [she] left NAMCO because of improprieties at the agency." Tr. 70. The quote she used was: "I left because I had to take a moral stand." *Id.* The people who received this abbreviated version of the story included Avner the Eccentric (SW Dep. 128); Paul Magid, a Flying Karamazov (SW Dep. 90); Jay Simpson, an investor in some of the touring productions and also Broadway shows like "Phantom of the Opera" (SW Dep. 85); Maurice Hines (SW Dep. 130); Stanley Kaye (SW Dep. 131); and Jim Sullivan of Festival Ventures (SW Dep. 92).

Weaving has also spoken about her termination with Richard Frankel, a producer of Penn & Teller (SW Dep. 85–86), Steve Disson, an event manager and coordinator (SW Dep. 86), Sam L'Hommedieu, a presenter and producer of shows in Washington (Tr. 88), Deborah Rathwell, a promoter from Canada who worked on the Music of Andrew Lloyd Webber (Tr. 89), and Susan Lee, from the League of American Theaters (Tr. 92, SW Dep. 130). She does not, however, remember whether, in her conver-

---

**3.** "SW Dep. ——" indicates a reference to the deposition of Susan Weaving, taken on March 7, 1991.

sations with these people, she discussed details about the alleged improprieties at NAMCO.

Martini has also disparaged NAMCO. At his deposition, Martini indicated that he does not remember exactly what he said in every conversation that he has had because "I talked to hundreds of people. I talk to a lot of people." RM Dep. 60.[4] Martini had a series of conversations with his co-producers of "A Chorus Line", Bob Young and Al Nocciolino, about their decision to terminate their booking arrangement with NAMCO. RM Dep. 15–21. In addition, Martini told John Breglio, an attorney who represents the authors in the New York Shakespeare Festival, which is licensor for "A Chorus Line", that "there were certain improprieties by the partners [at NAMCO]." RM Dep. 42. Most of the people Martini contacted, however, he told that he and his co-producers had terminated their use of NAMCO because "we didn't think we were going to be adequately represented." RM Dep. 81. People who were given this general information included Robert McDonald, general manager for the New York Shakespeare Festival (RM Dep. 43–44), and Richard Frankel, a producer of Penn & Teller (RM Dep. 80–81).

Although we make no findings at this time as to the truth or falsity of Weaving's and Martini's statements about NAMCO, it is well established that Weaving and Martini have disparaged NAMCO. By informing customers that she was forced to leave because of improprieties at NAMCO, and that the Weisslers had "covered up" these frauds, Weaving has made an assault on NAMCO's integrity—the *sine qua non* for a successful theatrical booking agency. Again, whether defendants' statements were *mis*representations is a question to be decided on the merits. For the purposes of establishing subject matter jurisdiction, plaintiffs have met the first requirement of an unfair competition claim under Section 43(a)(2).

As to the second element of the unfair competition claim, that defendants used the false or misleading representations "in commerce", on or in connection with any services, plaintiffs, characterizing this element as the statute's interstate commerce requirement, suggest that it is sufficient for defendants to have disparaged NAMCO's services. Plaintiffs point out that NAMCO is in the business of booking, *inter alia*, national and international road tours of theatrical productions. Because, plaintiffs assert, the allegedly false statements at issue in this litigation will " 'adversely affect [NAMCO's] interstate business' ", the statute's interstate commerce requirement is met. *See Arrow United Industries v. Hugh Richards, Inc.*, 678 F.2d 410, 413 n. 5 (2d Cir.1982). It appears from the language of the statute, however, that defendants themselves must "use" false or misleading representations "in commerce", not merely that plaintiffs' services must be used in commerce. Because this concern is addressed more directly and explicitly by the third element, "in the context of commercial advertising", we assume for the purposes of this discussion that it is sufficient for NAMCO's services to be used "in commerce", and that plaintiffs have met the second requirement.

As to the fourth element, plaintiffs have also demonstrated, for the purposes of establishing jurisdiction under the Lanham Act, that they believe themselves likely to be damaged by defendants' actions. Indeed, plaintiffs assert that they have already lost several of their major clients, including "A Chorus Line" and Penn & Teller, since Weaving's departure. Whether these losses are causally connected with defendants' disparagement of NAMCO is another issue to be considered on the merits.

The only remaining question, then, is whether defendants made false or misleading representations about NAMCO's services "in the context of commercial advertising or promotion." As the legislative history of the Trademark Law Revision Act

---

**4.** "RM Dep. ——" indicates a reference to the deposition of Richard Martini, taken on March 6, 1991.

makes clear, the "commercial advertising or promotion" language was intended to limit the reach of the amended Section 43(a) to advertising or promotion "for business purposes". 134 Cong.Rec. H 10420 (daily ed. October 19, 1988) (remarks of Rep. Kastenmeier).

> Under [the] proposed change [to the Lanham Act], *only* false or misleading "advertising or promotion" will be actionable, whether it pertains to the advertiser itself or the other party. The change would exclude all other misrepresentations from section 43(a) coverage. These others are the type which raise free speech concerns, such as a Consumer Report.... Product disparagement based on false representation would be actionable only if they were made in the context of advertising or promotion.

*Id.* at H 10420–21 (citation omitted).

Congress was especially concerned that the amendment to Section 43(a) pass muster under the First Amendment.

> To avoid legitimate constitutional challenge, it was necessary to carefully limit the reach of the subsection. Because section 43(a) will no[w] [5] provide a kind of commercial defamation action, the reach of the section specifically extends only to false and misleading speech that is encompassed within the 'commercial speech' doctrine by the United States Supreme Court.

134 Cong.Rec. H 10420 (daily ed. October 19, 1988) (Rep. Kastenmeier). Commercial speech has been defined as "expression related solely to the economic interests of the speaker and its audience." *Central Hudson Gas & Electric Corp. v. Public Service Comm'n of New York*, 447 U.S. 557, 561, 100 S.Ct. 2343, 2349, 65 L.Ed.2d 341 (1980).

█ The Senate's interpretation of the revised language of section 43(a) appears to be somewhat broader than the House's. According to Senator DeConcini,

the word "commercial" is intended only to eliminate any possibility that the section might be applied to political speech. Although the Senate sees this language as unnecessary because section 43(a) requires that the misrepresentations be made with respect to goods or services, we consider inclusion of the language so long as Congress' intent that it be interpreted only as excluding political speech is clear. It is also Congress' intent that the "commercial" language be applicable any time there is a misrepresentation relating to goods or services. Therefore, even though they are not commercial enterprises, nonprofit organizations would be as liable for misrepresentations as profit organizations.

134 Cong.Rec. S 16973 (daily ed. October 20, 1988). The Senate's expansive reading of the word "commercial" makes the word "commercial" superfluous, because the section requires that the misrepresentations be made with respect to goods or services. The Senate's interpretation also raises constitutional concerns because it fails to consider speech that relates to both goods and services, as well as political issues—for example, misrepresentations made by interested groups which may arguably disparage a company and its products because of the company's failure to divest its South African holdings, or disparaging statements regarding a corporation's policy toward product design, included in a law review article addressing the law of product liability. If "the 'commercial' language is applicable any time there is a misrepresentation relating to goods or services", the amended section 43(a) would be applicable to such political speech. To avoid these concerns, and to give the word "commercial" meaning, we read "commercial" to describe advertising or promotion for business purposes, whether conducted by for-profit or non-profit organizations. *See* 134 Cong.Rec. H 10421 (daily ed. October 19, 1988) (Rep. Kastenmeier).

---

5. In 134 Cong.Rec. H 10420 (daily ed. October 19, 1988), the text reads "[b]ecause section 43(a) will *not* provide a kind of commercial defamation action...." (emphasis added) In his corrections and amendments to his remarks, however, Rep. Kastenmeier changed the word "not" to "now". 135 Cong.Rec. H 1216 (daily ed. April 13, 1989).

Interpretations of Section 43(a) by other courts comport with this conclusion. For example, in *Wojnarowicz v. American Family Ass'n,* 745 F.Supp. 130, 141–42 (S.D.N.Y.1990), the court observed that Section 43(a) "has never been applied to stifle criticism of the goods or services of another by one ... who is not engaged in marketing or promoting a competitive product or service.... The section is narrowly drafted to encompass only clearly false and misleading commercial speech.' " *Id.* at 141–42 (quoting 134 Cong.Rec. H 10421 (daily ed. October 19, 1988)). Thus, Section 43(a) does not apply to a defendant who included edited reproductions of the plaintiff's photographs in a pamphlet criticizing the National Endowment for the Arts' funding of plaintiff's art, but who did not use the pamphlet in "advertising or promotion" of goods or services. *Id.* at 142.

 On the other hand, Section 43(a) will apply to misleading or false advertising that occurs before any products are actually sold. In *Matsushita Electric Corp. of America v. Solar Sound Systems, Inc.,* 381 F.Supp. 64 (S.D.N.Y.1974) (Conner, J.), the defendants bought one of plaintiff's portable radios overseas, brought it back to the United States, scratched out plaintiff's name and changed a few of the knobs and dials, and advertised "its newest model" at a trade show. Even though defendants had not sold any products yet, and no sales were expected until two months later, defendants, an ongoing concern, had received interstate orders from several major customers. The court determined that "[t]o rule that solicitation of sales is not 'commerce' would appear to leave the federal government powerless to prevent fraudulent interstate advertising.... Section 43(a) was clearly violated whether or not the misbranded unit itself was cause to 'enter into commerce'." *Id.* at 69.

Even though "Tour de Force", Weaving's planned future company, is not yet an "ongoing concern", plaintiffs argue that Weaving and her husband have in effect solicited sales, or engaged in commercial promotion in the context of the theatre-

booking industry, by disparaging NAMCO and informing NAMCO's clients and customers of Weaving's plans to start her own business. When the disparaging remarks about NAMCO were made, Weaving fully intended to be back in the booking business as soon as possible. She testified, "When asked what I was going to do, I answered that I was going to do what I've done my entire life, eventually. I was going week to week, as far as a decision, and I hoped to be able to make my living shortly.... At the beginning of February I thought by March 1 I would be able to." Tr. 101.

Weaving mostly had contact with clients asking "when can we talk. I would say why don't you check next week and I'll see if there's any difference or change. A lot of people said, you know, we'll call you next Monday." Tr. 55. Although she repeatedly emphasized that she could not solicit NAMCO clients, Tr. 77, and never recommended to anyone that they leave NAMCO because NAMCO could not satisfy the booking needs of its clients, Tr. 135, Weaving advised many of NAMCO's clients and customers, including Al Nocciolino (SW Dep. 76–77), Alan Spivak (SW Dep. 81), John Ballard (SW Dep. 83), Richard Frankel (SW Dep. 85), Tim DeBaets (SW Dep. 88) and Bob Young (SW Dep. 94–95), that she planned to be back in the business in the near future.

Martini has also advised presenters and producers, in the course of conversations he initiated about "A Chorus Line's" decision to terminate NAMCO's services, that his wife had left NAMCO and that she hoped to be back in business shortly. RM Dep. 60. Martini testified that he said to Alan Spivak, "[a]s [he] said to everybody else, [Weaving] would be back as soon as she could. She would be back in business as soon as she can." RM Dep. 72. He told them further that she hoped "it would be in a few weeks or so, that things would be worked out." RM Dep. 72.

In anticipation of starting her own business, within three weeks of leaving NAMCO, Weaving: selected a name for her venture, "Tour de Force"; looked at office space at 1501 Broadway in New York City,

and met with the agent for the landlord there (Tr. 55); discussed the expense of a phone system with her accountant (Tr. 56); and had discussions with her lawyer about setting up a corporation named "Tour de Force" (Tr. 56). In addition, four people have offered to give her financial support. Tr. 57. Specifically, she and Dan Koppel, who had a relationship with NAMCO and whom NAMCO had hoped to hire as an agent for international business for the 1991–92 season (Tr. 58–59), "discussed the fact that he would like to work for me and have an equity interest in the company." SW Dep. at 106–07.[6] Based on these facts, plaintiffs allege that Martini and Weaving have violated the Lanham Act.

██ Defendants respond first that Section 43(a) of the Lanham Act does not apply because there is no indication that Weaving was engaged in commercial services at the time her statements were made, or that the statements were made in furtherance of specific planned services. In other words, defendants argue that the Lanham Act applies only to existing goods and services. Under this interpretation of Section 43(a), a former officer of a business could prepare to form a competing business, announce a future commencement date and name for that business, destroy an anticipated competitor through false representations made during the period before the commencement of the new business, and then pick up the pieces of the ruined business. We do not believe that Congress intended to authorize such conduct, and we therefore do not believe that Section 43(a) should be read to apply only to existing goods and services. *See Matsushita Electric Corp. of America v. Solar Sound Systems, Inc.,* 381 F.Supp. 64, 69 (S.D.N.Y.1974).

Furthermore, we are satisfied that Weaving has taken sufficient steps toward the start of her new business for the Lanham Act to apply. "Tour de Force" is not a remote dream of Weaving's; it is nearly a reality. Indeed, Weaving would have been in business by March 1, 1991, if plaintiffs had not commenced this lawsuit. Moreover, it appears that, despite the fact that "Tour de Force" is not officially a company yet, at least two of NAMCO's former clients already consider themselves customers of Weaving's new company. First, in a letter dated March 5, 1991, to Barry Weissler of NAMCO, Alan N. Lichtenstein, director of theatre operations for Masonic Temple Theatre, writes, "I spoke with Mr. Martini concerning PIANO LESSONS [sic] for 3 weeks at the Fisher Theatre. I was notified that he or Susan Weaving will be handling this date and should work out the engagement with them." (Attached to Pltf's Reply Memorandum of Law, dated March 11, 1991) Second, in a letter also dated March 5, 1991, addressed to Michel Vaga at NAMCO, Charles Miller, director of theatre at Raritan Valley Community College, indicates that he is "in touch with Tim Tebates [sic] and through him with Susan Weaving about the Flying Karamazov Brothers for 1991–92. I am now dealing with them on this program, so I will no longer be trying to book them through NAMCO." (Attached to Pltf's Reply Memorandum of Law, dated March 11, 1991) Because at the time Weaving made disparaging remarks about NAMCO she anticipated being in business shortly, and because she is well on her way to establishing "Tour de Force", her alleged "solicitations" of new clients are covered by the Lanham Act even though no services have yet been rendered.

Second, defendants argue that Weaving's and Martini's actions do not constitute "commercial advertising or promotion", and that therefore regulating their actions violates their First Amendment rights. Defendants characterize Weaving's conduct

---

**6.** According to the hearing transcript, Weaving has also prepared advertising brochures for her new venture. Tr. 149. According to her counsel, however, there is an error in the transcript, and Weaving's answer to the question about whether she has prepared advertising brochures should be "no". Of course, an affidavit from Weaving, rather than a representation from counsel, would have been more appropriate to clarify any error in the trial transcript. Nevertheless, we assume for the purposes of this motion that Weaving has not prepared any advertising brochures.

as "common 'bad-mouthing,'" that is, "when, in response to personal queries or during one-on-one discussions with long-time friends and business associates, a speaker criticizes the business of another to a listener with an interest in the business being discussed." Defendant's Memorandum of Law, dated March 19, 1991, at 10. Rather than affirmatively broadcasting disparagement to the consuming public, defendants argue that they responded truthfully to inquiries and engaged in a very limited amount of discussion with individuals: (1) to whom they had a fiduciary duty to report this information, (2) whose business judgment was solicited, or (3) who had a legitimate interest in why defendant Weaving terminated her employment. *Id.* at 11.

It is true that defendants' conduct—speaking by telephone with a number of friends, acquaintances, and colleagues about the reasons for terminating their relationships with NAMCO—is not "commercial advertising and promotion" in the traditional sense of large-scale, nationwide commercial advertising campaigns. In the context of the theatre-booking industry, however, "services" are "promoted" by word-of-mouth and information is spread through a network of telephone contacts with producers, promoters, and presenters. Thus, in the short time after she left NAMCO on January 31, 1991, and before this lawsuit was commenced on March 1, 1991, Weaving spoke with 10 of NAMCO's 30 clients and with 10 customers who have had contact with NAMCO during the past 15 years. In an industry that is indisputably small and closely interconnected, Weaving's alleged "advertising campaign", assertedly conducted with her husband's help, appears to have been quite effective.

In addition, as plaintiffs point out, defendants were not merely responding to inquiries. Rather, Martini, who works as a producer in the same industry as his wife, himself initiated conversations with most of the presenters. Martini Dep. at 75. He spread the word to the "consuming public" (a) that he has terminated NAMCO's services for good cause, (b) that his wife has resigned from NAMCO for "moral" reasons, and (c) that she expects to start her own new competing business in the very near future. In turn, NAMCO's clients called Weaving, the former NAMCO president, to inquire into why she left NAMCO, and to ask her when she planned to return to the booking industry with her own company. Thus, while Weaving appeared to be honoring her no-compete clause, she was, according to the plaintiffs, soliciting, with her husband's help, clients and customers for her own company.

We recognize that some of Weaving's and Martini's conversations may have been purely or primarily social calls with friends who also happen to be their business associates. Such conversations arguably are not "commercial speech", which, as we have noted, has been defined as "expression[s] related *solely* to the economic interests of the speaker and its audience," *Central Hudson Gas & Electric Corp. v. Public Service Comm'n of New York*, 447 U.S. 557, 561, 100 S.Ct. 2343, 2349, 65 L.Ed.2d 341 (1980) (emphasis added). Speech may be classified as commercial, however, even when, in addition to having a business purpose, it has an informational or a social purpose. For example, in *Bolger v. Youngs Products Corp.*, 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983), the Supreme Court considered whether pamphlets containing information about sexually transmitted diseases should be classified as "commercial" in nature. The Court observed that the pamphlets were not only informational but also advertisements which contained references to the publisher's products and that the publisher had an economic motivation for mailing them. *Id.* at 66–67, 103 S.Ct. at 2880–81. Thus, the Court classified the pamphlets as "commercial", notwithstanding their non-commercial aspects. *Id.* at 67, 103 S.Ct. at 2880. *See also Fox v. Board of Trustees*, 841 F.2d 1207, 1213 (2d Cir.1988) (despite informational and social benefits of presentations about products, presentations were "commercial speech").

Similarly, some of Weaving's and Martini's speech may properly be classified as "commercial", notwithstanding its social

aspects. We are unable to discern at this time which of Weaving's conversations were primarily social or primarily commercial. For purposes of establishing jurisdiction under the Lanham Act, however, plaintiffs have sufficiently demonstrated that some of Weaving's conversations may have been "solely", or at least primarily, for business purposes. Thus, we find that Martini's and Weaving's conduct, assuming it occurred as plaintiffs allege, is "commercial speech" within the ambit of the Lanham Act, and that applying the Lanham Act to such conduct does not violate their First Amendment rights.

Defendants argue that the conspiracy allegations in the Amended Complaint, ¶¶ 10, 33, 41–42, are conclusory and unsupported by anything in the record other than the fact that Weaving and Martini are married and work in the same industry. This is no basis, Martini and Weaving argue, for linking them together in a conspiracy. Aside from their marriage, Martini and Weaving contend, they are independent people who received the same information about improprieties at NAMCO and had independent responses to it.

At the hearing on the matter, however, defendants acknowledged that it would be a "different story", that is, a conspiracy to violate the Lanham Act could be stated, if Martini had said: "And I told them that my wife is leaving and she's going to set up a new agency and you ought to go to them." Tr. 158–59. As noted earlier, Martini has told "everybody" that Weaving would be back in business as soon as she could work everything out. (RM Dep. 72) In addition, Martini "possibly" discussed his wife's termination of employment with NAMCO with several people, including Richard Frankel (RM Dep. 79), and John Breglio (RM Dep. 41–43).[7]

Although plaintiffs' conspiracy theory is at this time not fully developed or conclusively supported by the record, and although the connection between Martini and Weaving is admittedly thin, we find that

plaintiffs have stated a claim, for purposes of establishing subject matter jurisdiction, of unfair competition under Section 43(a)(2) of the Lanham Act. Our findings and our conclusions are necessarily preliminary ones made solely to determine whether we have jurisdiction—a close question involving the interpretation of a new amendment to the Lanham Act. Whether or not plaintiffs can establish that defendants actually acted in concert to violate the Lanham Act is a question to be resolved on the merits.

### III. *Conclusion*

Defendants' motion to dismiss for lack of subject matter jurisdiction is denied.

SO ORDERED.

---

**7.** We observe that Martini was directed not to answer a question about conversations he has had with Weaving about the operation of a booking business in the near future. Martini

Dep. 83. Apparently, the objection to the question was based either on its being beyond the scope of the deposition or on the marital privilege.