**OXYCAL LABORATORIES, INC.,**
**an Arizona Corporation,**

**and**

**Inter–Cal Corporation, an Arizona Corporation, Plaintiffs,**

**v.**

**Jim JEFFERS and Lou B. Jeffers, dba Quest for the Best; John A. Perkins, dba Promotion Publishing; and Hulda C. Clark, Defendants.**

**Civil No. 95–1200–R.**

United States District Court, S.D. California.

Dec. 4, 1995.

William H. Drummond, David G. Duckworth, Drummond and Duckworth, Newport Beach, CA, for plaintiffs.

Charles Scott, Victoria A. Stewart, Barwick, Rutherford & Scott, Lemon Grove, CA, for defendants.

## ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

RHOADES, District Judge.

This matter is before the Court on Plaintiffs' Motion for Preliminary Injunction. For the reasons stated below, Plaintiffs' Motion is DENIED.

### I. Background

Plaintiffs Oxycal Laboratories, Inc. and Inter–Cal Corporation, (collectively "Oxycal") are manufacturers and suppliers of vitamin C products. Oxycal's patented products are sold under the federally registered trademark ESTER–C. Plaintiffs claim that the tradename ESTER–C is a leading product in the vitamin C market, and that Oxycal has built up valuable "significant commercial goodwill" in the good name of the ESTER–C product line.

Hulda A. Clark ("Clark") is the author of a book entitled *The Cure for All Cancers* ("Clark's Book"). John A. Perkins, doing business as "ProMotion Publishing," is the publisher of the Book, and is engaged in promoting its sale. Jim Jeffers and Lou Jeffers (collectively, "the Jeffers") are principals of, and doing business as, Quest for the Best. Plaintiffs allege that the Jeffers actively promote the sale of the Book as a vehicle for increasing sales of some of their products which are recommended in the Book. In July of 1994, Oxycal began receiving reports that consumers were, after reading Clark's Book, becoming concerned that ESTER–C products caused cancer. Oxycal claims that they received a substantial number of calls from "existing customers, potential customers, large clients, existing distributors and even a governmental consumer protection agency" worried about the potential carcinogenic characteristics of ESTER–C. *See* Declaration of David R. Stenmoe at ¶ 15–20.

The reason for the concern about the carcinogenic effects of ESTER–C is that Clark's Book alleges that the mineral Thulium contributes to the occurrence of cancer. Furthermore, the Book also alleges that ESTER–C products contain Thulium. *See* Motion Exhibit A at 18 ("*All* the ESTER–C varieties of vitamin C that I have tested are polluted with Thulium!"). Clark's Book claims that all cancers can be rid from the human body by eliminating harmful toxins, such as Thulium. The Book provides for activities that can be done to eliminate harm-

ful materials from the body, including avoiding certain foods, avoiding exposure to certain household items, etc. The Book also identifies methods for testing for the presence of certain toxins that should be avoided. In short, the Book provides a comprehensive plan for identifying and removing all causes of cancer.

After becoming aware that Clark's Book alleged that ESTER–C contains Thulium and that Thulium causes cancer, Oxycal hired a Dr. Jack Hegenauer, PhD., to conduct a study of ESTER–C and Thulium to test the allegations contained in Clark's Book. Dr. Hegenauer concluded that ESTER–C contains no Thulium, and that to date there is no scientific evidence of a causal link between Thulium and cancer. *See* Dr. Hegenauer Declaration at ¶ 22, 30, 31.

Concerned that the continued dissemination of false information concerning ESTER–C would irreparably harm the reputation of ESTER–C, result in "millions of dollars of lost sales" and thus cause inestimable damage to the financial health of Oxycal, *see* Stenmoe Declaration at ¶ 20, Oxycal moved for a preliminary injunction. Oxycal's complaint is based on a violation of the Lanham Act, specifically 15 U.S.C. § 1125(a), and the request for a preliminary injunction is made pursuant to a provision of the Lanham Act at 15 U.S.C. § 1116(a).

## II. Discussion

### A. Authority For a Preliminary Injunction

The Lanham Act gives district courts explicit authority to grant injunctive relief to prevent violation of 15 U.S.C. § 1125(a). Section 1116 of Title 15 provides that "[t]he several courts vested with jurisdiction of civil actions arising under this chapter shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, ... to prevent a violation under section 1125(a) of this title." The Ninth Circuit has applied the same standard to a request for preliminary injunction under § 1125(a) as that applied to requests for preliminary injunctions in general. *See Sega Enterprises, Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1517 (9th Cir.1992).

### B. Standard for Granting Preliminary Injunction

To prevail on a request for preliminary injunctive relief, the moving party must show either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in its favor. *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 174 (9th Cir.1987); *Sports Form, Inc. v. United Press International, Inc.*, 686 F.2d 750, 753 (9th Cir.1982). These formulations are not different tests; they represent two points on a sliding scale in which the showing of irreparable harm must increase as the probability of success on the merits decreases. *Odessa Union*, 833 F.2d at 174. The Ninth Circuit has indicated that "serious questions" are issues "to which the moving party" has a "fair chance of success on the merits." *Sierra On–Line v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984).

### C. Chance of Success on the Merits

Under either formulation of the test for a preliminary injunction, the district court must first evaluate the moving parties chance of success on the merits of the claim. Here, the Court finds that Oxycal has little chance of success on the merits of its claim based on violation of § 1125(a). Since Oxycal has little chance of success on the merits, Oxycal cannot meet the requirements for a grant of a preliminary injunction under either formulation of the test, and the motion must be denied.

#### 1. 15 U.S.C. § 1125(a)

Oxycal has brought its suit under 15 U.S.C. § 1125(a)(1)(A) and § 1125(a)(1)(B). *See* Reply at 3. The Court finds that Oxycal has little chance of success on the merits under either (a)(1)(A) or (a)(1)(B). § 1125(a)(1) reads:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combina-

tion thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Although Oxycal claims to have brought its action under both (a)(1)(A) and (a)(1)(B), Oxycal has made no argument that the statements contained in Clark's Book are actionable under (a)(1)(A). Oxycal has not alleged that there is any confusion as to the "affiliation, connection or association" of defendants with any other person, nor has Oxycal identified any confusion as to the "origin, sponsorship or approval" of defendants' goods, services or commercial activities. Indeed, aside from the assertion that "Oxycal has brought this suit under 15 U.S.C. § 1125(a)(1)(A) or (B)," Reply at 3, Oxycal makes no argument that it has established a prima facie case for a violation of § 1125(a)(1)(A).

The crux of Oxycal's complaint is that statements made in Clark's Book misrepresent the characteristics of Oxycal's ESTER–C product line. Oxycal's allegations are covered, if at all, by § 1125(a)(1)(B) which is concerned with false or misleading representations of fact which "misrepresent the nature, characteristics, qualities . . . [of] another person's goods, services or commercial activities." The Court must evaluate the likelihood of success on this (a)(1)(B) cause of action.

A threshold requirement of stating a cause of action under § 1125(a)(1)(B) is that the false or misleading representations of fact be made "in commercial advertising or promotion." After carefully considering the leg-

islative history of the Lanham Act, and the treatment of this issue by other courts, this Court concludes that the statements made in the contents of Clark's Book are not statements made "in commercial advertising or promotion."

### a. Commercial Advertising or Promotion

■ 15 U.S.C. § 1125(a)(1)(B) on its face is clearly only applicable to misrepresentations made in commercial advertising or promotion. The Lanham Act is necessarily limited in scope by the First Amendment. *See Gordon & Breach Science Publishers v. AIP,* 859 F.Supp. 1521, 1533 (S.D.N.Y.1994). In adopting § 1125(a)(1)(B), Congress explicitly limited the reach of the Lanham Act to statements made in commercial advertising or promotion in order to preserve its constitutionality. The legislative history supports the idea that the language chosen was selected to ensure that the Lanham Act did not impermissibly restrict protected speech. *See* 135 Cong.Rec. H1216–17 (daily ed. April 13, 1989) (statement of Rep. Kastenmeier) ("[T]he proposed change in section [1125(a) ] should not be read in any way to limit political speech, consumer or editorial comment, parodies, satires, or other constitutionally protected material . . . The section is narrowly drafted to encompass only clearly false and misleading speech."); *see, also,* 134 Cong.Rec. 31,851 (Oct. 19, 1988) (statement of Rep. Kastenmeier) (§ 1125(a) "specifically extends only to false and misleading speech that is encompassed within the 'commercial speech' doctrine developed by the Supreme Court.").

The Legislative History coming out of the Senate indicates that the Senate envisioned a more sweeping role for the Lanham Act. Senator DeConcini is quoted as saying that employing the term "commercial" in § 1125(a)(1)(B), Congress

> intended only to eliminate any possibility that the Section might be applied to political speech. . . . [W]e consider inclusion of the language [the word "commercial"] harmless so long as Congress' intent that it be interpreted only as excluding political speech is clear. It is also Congress' intent the 'commercial' language be applicable

any time there is a misrepresentation relating to goods or service. Therefore, even though they are not commercial enterprises, non-profit organizations would be as liable for misrepresentation as profit organizations.

134 Cong.Rec. S16973 (Oct. 20, 1988).

However, whatever the understanding of the Senate when they passed this law, the law is still subject to the requirements of, and limited by, the First Amendment. As one professor has noted:

> [t]he senator's view, if taken literally, would allow a [§ 1125(a)] claim against *Consumer Reports....* Such a view is unsound for two primary reasons. First, it is textually insupportable, given the statutes "commercial advertising and promotion" limitations. 15 U.S.C. § 1125(a) (1988). Second, magazines and periodicals are customarily classified as primarily noncommercial and therefore entitled to full First Amendment protection.... *See, also, National Artists Management Co. v. Weaving,* 769 F.Supp. 1224, 1232–36 (S.D.N.Y.1991) (rejecting Sen. Deconcini's apparent view of statutes scope as overly broad).

Arlen W. Langvardt, "Section 43(a), Commercial Falsehood, and the First Amendment: A Proposed Framework", 78 *Minn. L.Rev.* 309, 329 n. 79 (1993). Therefore, as both Plaintiff and Defendant acknowledge, the Lanham Act can only reach commercial speech. *See, e.g., Gordon & Breach,* 859 F.Supp. at 1534; Opposition at 1–4; Reply at 4.

Though the Lanham Act is applicable only to "commercial advertising and promotion," it is clear that the law reaches more than the typical advertising campaign. *Semco, Inc. v. Amcast, Inc.,* 52 F.3d 108, 112 (6th Cir.1995) (article written for trade magazine may be classified commercial promotion); *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983) (mailing of informational pamphlets by non-profit organization can be classified commercial speech); *Gordon & Breach,* 859 F.Supp. at 1534–36; *Birthright v. Birthright, Inc.,* 827 F.Supp. 1114, 1138 (D.N.J.1993) (non-profit fundraising letters can be commercial advertising); *National Artists Mgmt. Co. v. Weaving,* 769 F.Supp. 1224, 1234–36 (S.D.N.Y. 1991) (former employee's bad-mouthing of employer can fit into category of commercial advertising).

■ However, to even fall within the category of commercial advertising and promotion, the communications must first be found to be commercial speech. The most common definition of commercial speech is "speech proposing a commercial transaction." *United States v. Edge Broadcasting Co.,* 509 U.S. 418, ——, 113 S.Ct. 2696, 2703, 125 L.Ed.2d 345 (1993); *Board of Trustees v. Fox,* 492 U.S. 469, 473–74, 109 S.Ct. 3028, 3030–31, 106 L.Ed.2d 388 (1989); *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 64, 103 S.Ct. 2875, 2878–79, 77 L.Ed.2d 469 (1983). Commercial speech is entitled to a lesser degree of protection than other forms of constitutionally guaranteed expression. *Edge Broadcasting,* 509 U.S. at ——, 113 S.Ct. at 2703; *Fox,* 492 U.S. at 477, 109 S.Ct. at 3033. The Government may regulate commercial speech in ways that it may not regulate other speech. *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 770–73, 96 S.Ct. 1817, 1829–31, 48 L.Ed.2d 346 (1976). Specifically, the government may regulate commercial speech to ensure that it is not false, deceptive or misleading. *City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 431–32, 113 S.Ct. 1505, 1518, 123 L.Ed.2d 99 (1993).

■ Commercial speech that is found to be false or misleading is afforded no First Amendment Protection at all. *Discovery Network,* at 433–34, 113 S.Ct. at 1519 (Blackmun, J., concurring); *accord Central Hudson Gas & Elec. Corp. v. Public Serv. Comm.,* 447 U.S. 557, 562–63, 100 S.Ct. 2343, 2349–50, 65 L.Ed.2d 341 (1980). This is because a listener "has little interest in receiving false, misleading, or deceptive commercial information." *Discovery Network,* 507 U.S. at 432, 113 S.Ct. at 1518 (Blackmun, J., concurring). However, if speech is found to be non-commercial speech, even falsehoods contained in the speech will be given protection. The Supreme Court has made clear that

Constitutional protection does not turn upon "the truth ... of the ideas and beliefs which are offered." ...

The erroneous statement is inevitable in free debate, and ... it must be protected if the freedoms of expression are to have the "breathing space" that they "need ... to survive."

*New York Times Co. v. Sullivan,* 376 U.S. 254, 271–72, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964) (citations omitted); *see, also, Hustler Magazine v. Falwell,* 485 U.S. 46, 51–52, 108 S.Ct. 876, 879–80, 99 L.Ed.2d 41 (1988) (false statements of fact are protected as well as opinion). Therefore, if false or misleading speech is non-commercial it is afforded full First Amendment protection, and if it is commercial, it falls entirely outside the protection of the First Amendment, *Discovery Network,* 507 U.S. at 433–34, 113 S.Ct. at 1519, and would be subject to prior restraints such as the injunction urged by Oxycal. *See, e.g., Castrol, Inc. v. Quaker State Corp.,* 977 F.2d 57 (2d Cir.1992).[1]

Whether speech will be deemed commercial is a difficult question that requires careful analysis. Although the Supreme Court has defined commercial speech as "speech promoting a commercial transaction," *Edge Broadcasting,* 509 U.S. at ——, 113 S.Ct. at 2703, the Court has also recognized "the difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category." *Discovery Network,* 507 U.S. at 419, 113 S.Ct. at 1511. The Court then recognized that "expression related solely to the economic interests of the speaker and its audience" will be considered commercial speech. *Id.* The Court has recognized that, often, these definitions will not be helpful and that a broader and more nuanced inquiry may be required. *See id.*

■ This Court does not find this to be a difficult case. The Court finds that the main purpose of Clark's Book is not to propose a commercial transaction, and Clark's writing is not solely related to the economic interests of the speaker and its audience. Clark has written a book setting out a comprehensive plan for the elimination of the causes of cancer from peoples' lives. The Court cannot inquiry into the validity of her scientific theories, nor should it. *See, e.g., Keyishian v. Board of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 683–84, 17 L.Ed.2d 629 (1967) (academic freedom is "a special concern of the First Amendment"). Clark's expressions in the Book could be impermissibly silenced if she had to worry about liability for every statement made in her work. *See, e.g., New York Times,* 376 U.S. at 279, 84 S.Ct. at 725–26 (would-be contributors to the academic debate "may be deterred from voicing their [opinion], even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so."). As Professor Langvardt points out, "[t]he Supreme Court has recognized that in order to further First Amendment rights to engage in truthful expression, it may sometimes be necessary to allow defendants to escape liability for certain false statements." Langvardt, 78 *Minn.L.Rev.* at 311 n. 5 (citing *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 340–41, 94 S.Ct. 2997, 3007–08, 41 L.Ed.2d 789 (1974); *New York Times,* 376 U.S. at 271–72, 84 S.Ct. at 721–22.)

Even if the general purpose of the Book is not to promote a commercial transaction, it is possible that the Book contains speech which qualifies as commercial. *See Discovery Network,* 507 U.S. at 419–21, 113 S.Ct. at 1511–12 (acknowledging that a single document can contain both commercial and non-commercial speech). When faced with hybrid speech, a single document which contains both commercial and non-commercial messages, the Supreme Court has taken different approaches. In *Bolger v. Youngs Drug Products Corp.,* 463 U.S. at 62, 103 S.Ct. at 2877–78, the Court refused to allow a firm to mask the essentially commercial nature of its information by adding non-commercial informational content. However, the Supreme Court has also ruled that where the main purpose of the work is non-commercial, and the commercial and non-commercial compo-

---

**1.** For the law concerning prior restraint on noncommercial speech, see *Near v. Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931).

nent parts of "a single speech are inextricably intertwined, we cannot parcel out the speech, applying one test to one phrase and another test to another phrase ... Therefore, we apply our test for fully-protected expression." *Riley v. National Federation of the Blind,* 487 U.S. 781, 795–96, 108 S.Ct. 2667, 2677, 101 L.Ed.2d 669 (1988); *see, also, Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980).

The key seems to be a determination of whether the speech is primarily motivated by commercial concerns, or whether there is sufficient non-commercial motivations. *See, e.g.,* Paul A. Batista, "Lanham Act Revision Mat Spur Commercial Defamation Claims," *Nat'l.L.J.,* Sept. 30, 1991 at 44 (asserting that presence of meaningful non-commercial motivations may remove statements from scope of § 1125(a), notwithstanding simultaneous presence of arguable commercial motivations); *see, also,* Langvardt at 328 n 48. Here, the Court has found that there is insufficient evidence that the main purpose of Clark's Book is to promote a commercial transaction. Based on the evidence before this Court, it seems unlikely that Oxycal would be able to establish that the central message of the Book is commercial. The Book is approximately 500 pages long. The Book makes explicit reference to ESTER–C three times in 500 pages. Throughout the Book, the author does make suggestions about activities to do, foods to eat, products to use and buy, etc. The Book also contains an appendix which describes where certain of the recommended products may be purchased. However, to go so far as to conclude from those facts alone that the Book is merely a mechanism for the sale of those products is too much of a stretch.

The Court concludes that Oxycal has a very low likelihood of establishing that Clark's Book is commercial speech. If the Book is not commercial speech, the statements made in the Book do not come within the definition of commercial advertisement and promotion, and are beyond the scope of the Lanham Act, § 1125(a)(1)(B). Since Oxycal has not demonstrated a significant likelihood of success on the merits, they fail to meet the requirement for a preliminary injunction under the first formulation of the test. Since Oxycal has not even established a fair chance of success on the merits, they fail under the second formulation of the test as well.

Oxycal argues that Clark's Book is clearly commercial speech for several reasons. First they argue that the fact that the Book condemns the purchase and use of certain products while promoting the sale of other products is sufficient to establish its commercial nature. The Court has addressed this argument above. The Court finds that the commercial elements of the speech are intertwined with the central message, and that the non-commercial aspects are not merely a mask for the essentially commercial nature of the Book. Oxycal relies on *Semco, Inc. v. Amcast, Inc.,* 52 F.3d 108 (6th Cir.1995) for their argument. However, in *Semco,* the Sixth Circuit found that the primary purpose of the speech was commercial. They noted that the defendant, although ostensibly writing an article describing a manufacturing product "presented an article peppered with advertising for Amcast." *Id.* at 113. Furthermore, after the article was published, Amcast took reprints of the article, made copies and distributed them as a promotional brochure at trade shows. The extreme situation which led the Sixth Circuit to conclude that Amcast was engaging in advertising is not present in the present matter involving Clark's Book. Considering the absence of the factors that the Sixth Circuit found significant, this Court remains convinced that Clark's Book is non-commercial speech.

Second, Oxycal argues that Defendants have an economic motivation for the sale of the Book because they are selling the Book for almost $20.00 a copy. However, the Supreme Court in *Bolger* stated that merely having an "economic motivation ... would clearly be insufficient by itself to turn the materials into commercial speech." 463 U.S. at 66–67, 103 S.Ct. at 2880. Indeed, under Oxycal's reasoning, every article in the New York Times would be commercial speech because the paper is sold to make a profit. Finally, Oxycal argues that the author has financially gained from the promotion of certain products in the Book because they are sold by a company in which the author has

an interest. Again the Court finds this insufficient to establish that main purpose of the book was to promote a commercial transaction. Clark allegedly has an interest in one of the stores listed in the appendix of the Book. The store is listed in connection with *one* of the recommended products. That product, Black Walnut Hull Tincture, is also available at another store listed in the book. Furthermore, the Book contains detailed instructions on how to *make* the product at home. The purpose of this Book is not primarily a means to sell the Black Walnut Hull Tincture, or any of the other products listed in the Book.

The Court, at this stage in the proceedings finds that the purpose of the Book is to advance Clark's theories on the causes of cancer and the ways to eliminate cancer. That her methods recommend the use of certain products is secondary. That her theories may lack scientific foundation is not for this Court to decide. Clark's Book is non-commercial speech which is afforded First Amendment protection. Oxycal has no significant likelihood of success on the merits of its claim for a violation of the Lanham Act.

Oxycal has made several other arguments that are of no avail in establishing their likelihood of success on the merits. First they argue that untruthful speech, commercial or otherwise, is afforded no First Amendment protection. For this proposition they cite *Virginia State Board of Pharmacy*, 425 U.S. at 771, 96 S.Ct. at 1830–31. There the Court said that untruthful speech has never been protected *for its own sake.* However, the Court has protected false non-commercial speech *for other reasons. See, e.g., New York Times,* 376 U.S. at 279, 84 S.Ct. at 725–26 (protecting false speech to avoid chilling free expression); *Gertz,* 418 U.S. at 340–41, 94 S.Ct. at 3007–08. Second, Oxycal ar-

gues that courts have ruled that the First Amendment has no application to suits brought under the Lanham Act. For this they cite *Castrol, Inc. v. Pennzoil Company,* 987 F.2d 939, 949 (3d Cir.1993). However, the decision in *Castrol* was limited to commercial speech. The court acknowledged that false commercial speech is afforded no protection, and may be banned entirely. *Id.* (citing *Bates v. State Bar of Arizona,* 433 U.S. 350, 383, 97 S.Ct. 2691, 2708–09, 53 L.Ed.2d 810 (1977). Finally, in support of their motion, Oxycal argues that Clark's statements are false and that Defendants have not even contested the falsity of the statements. As noted above, unless the speech is determined to be commercial speech, § 1125(a)(1)(B) does not apply, and the truth or falsity of the statements is not at issue.[2] Defendants have not argued the truth or falsity of the statements because their truthfulness is not at issue if the speech is non-commercial. Even if this Court assumes for the purposes of this ruling that the speech is false, the decision stands exactly as written.

### III. Conclusion

For the reasons stated above, Oxycal's motion for a preliminary injunction is DENIED. The Court finds that Oxycal is unlikely to be able to establish that Clark's Book is commercial speech [3], subject to the regulations of 15 U.S.C. § 1125(a)(1)(B). Since Oxycal has shown no likelihood of success on the merits, the request for a preliminary injunction must be denied.

IT IS SO ORDERED.

---

**2.** This Court is making no determination as to whether Oxycal would have a cause of action based on any other theory, nor whether the speech at issue would be protected in such a case. For the purposes of this motion, the Court is concluding only that Oxycal is unlikely to be able to establish that the speech at issue is commercial speech, subject to regulation under 15 U.S.C. § 1125(a)(1)(B).

**3.** The Court cannot conclude as a matter of law at this time that Clark's Book is non-commercial speech. Oxycal may be able to present evidence

that the major purpose behind the writing and publishing of this Book was to promote the sale of certain products referenced therein. If Oxycal establishes that the Book is merely a front for the promotion of those products, the Book may well be commercial speech. However, at this time, Oxycal has not established this, nor even made a showing that they have a fair chance at making such a showing. For the purposes of this request for a preliminary injunction, Oxycal has demonstrated no likelihood of success on the merits.