FUENTE CIGAR, LTD., a foreign corporation, Plaintiff,

v.

OPUS ONE, a California general partnership, Defendant.

OPUS ONE, a California general partnership, Plaintiff,

v.

FUENTE CIGAR, LTD., a foreign corporation, and Fuente & Newman Premium Cigars Limited, Inc., a Florida corporation, Defendants.

Nos. 96-2389-CIV-T-24 (E), 97-346-CIV-T-24 (E).

United States District Court, M.D. Florida, Tampa Division.

Nov. 5, 1997.

*ORDER*

BUCKLEW, District Judge.

This cause comes before the Court on Plaintiff/Counter–Defendant Fuente Cigar Ltd.'s Motion to Amend (Doc. No. 25, filed May 2, 1997) and Defendant/Counter–Plaintiff Opus One's Motion to Amend (Doc. No. 34, filed June 17, 1997). On May 15, 1997, Opus One filed a response in opposition to Fuente Cigar Ltd.'s Motion to Amend (Doc. No. 28); and on June 30, 1997, Fuente Cigar Ltd. and Fuente & Newman Premium Cigars Ltd. filed a response in opposition to Opus One's Motion to Amend (Doc. No. 39). Concluding that both responses were essentially motions to dismiss, this Court granted each party leave to file a reply to its opponent's response, (Doc. No. 42, filed July 8, 1997), and both Fuente Cigar Ltd. and Opus One did so—Fuente Cigar Ltd. on July 28, 1997 (Doc. No. 56), and Opus One also on July 28, 1997 (Doc. No. 53). In the interim, Opus One also moved to amend to add a specific prayer for damages (Doc. No. 48), a motion that Fuente Cigar Ltd. and Fuente & Newman Premium Cigars Ltd. opposed (Doc. No. 63, filed Aug. 4, 1997).

## I. BACKGROUND

Fuente Cigar Ltd. is a manufacturer of "premium," handmade cigars, whose principal place of business is the Dominican Republic. Fuente & Newman Premium Cigars Ltd., a Florida corporation, is its distributor. (Hereinafter, the Court shall refer to the two collectively as "Fuente.") In 1991 and 1992, Fuente developed a new cigar that it initially called "FUENTE FUENTE OPUS X." This mark was registered with the United States Patent and Trademark Office on July 23, 1996. (Doc. No. 25, ex. A.) According to Fuente, the mark has subsequently evolved into "FUENTE FUENTE OPUSX." (Doc. No. 25, ex. B.) It is disputed whether the "X" in "OPUSX" is properly (or commonly) understood to designate the Roman numeral or the alphabetical character.

Opus One is a California general partnership that produces a "premium" red wine whose mark is "OPUS ONE." (Doc. No. 39, ex. A.) In 1995, Opus One acquired the rights to use the mark "OPUS ONE" with

William C. Guerrant, Jr., Hill, Ward & Henderson, P.A., Tampa, FL, R. Dennis Claessens, Robert M. Ward, Patricia A. Kane, Joseph P. Regan, Hill, Steadman & Simpson, P.C., Chicago, IL, for Fuente Cigar, Ltd., Fuente & Newman Premium Cigars Limited Inc.

C. Douglas McDonald, Jr., Pettis & McDonald, PA, Tampa, FL, John K. Uilkema, Limbach & Limbach L.L.P., San Francisco, CA, John L. Cooper, James W. Morando, Farella Braun & Martel LLP, San Francisco, CA, for Opus One.

William C. Guerrant, Jr., Hill, Ward & Henderson, P.A., Tampa, FL, R. Dennis Claessens, Robert M. Ward, Hill, Steadman & Simpson, P.C., Chicago, IL, for William M. Sharp, Sharp, Smith & Harrison, P.A., Kalish & Ward, Thomas P. McNamara.

regards to tobacco products from a German company that was selling pipe tobacco under that name. (Doc. No. 25, ex. E.) On June 2, 1995, Opus One filed an application with the United States Patent and Trademark Office to use the "OPUS ONE" mark as to tobacco products. (Doc. No. 39, Ex. A.) Currently, Opus One does not produce, distribute or license its name for use with any cigar, but the company has negotiated with another manufacturer of premium cigars to create an "OPUS ONE" cigar. (Doc. No. 25, ex. E.) Opus One alleges that this venture has been halted out of concerns about confusion between an "OPUS ONE" cigar and Fuente's "OPUSX." (Doc. No. 49, Ex. A.)

On October 2, 1996, Opus One initiated a trademark infringement action against Fuente in the United States District Court for the Northern District of California. Fuente subsequently filed a declaratory judgment action in this Court. The two actions were combined when the California action was transferred to this District.

In the very early stages of litigation, some time around November of 1996, a representative of Opus One was interviewed for an article in *Cigar Insider,* a trade publication of the cigar industry. In the article, the Opus One representative stated that "[i]n our view, [the term "OPUS"] is clearly being used on [Fuente's] cigars to trade on our reputation," and that Fuente had "effectively appropriated" Opus One's mark. (Doc. No. 25, ex. E.) Referring to the cigar as "Opus Ten," the Opus One representative stated that Fuente could call its cigar what it liked, "but don't call it Opus or Opus One." *Id.*

## II. DISCUSSION

Opus One has now moved to Amend its complaint to add a count for dilution under the Lanham Act, § 1125(c). In addition, Opus One has moved to amend to add a specific prayer for money damages with respect to its trademark infringement claims under the Lanham Act, 15 U.S.C. § 1117(a).

In situations in which a responsive pleading has been served, Rule 15(a) of the Federal Rules of Civil Procedure provides that a party may amend its pleading by written consent of the adverse party or by leave of

the Court. In the instant action, because both Fuente and Opus One have explicitly withheld their consent to their opponents' proposed amendments, the question is whether the Court should grant leave to amend. Rule 15(a) advises that such leave "shall be freely given when justice so requires." The Supreme Court has stated that "this mandate is to be heeded":

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the amendment, futility of the amendment, etc.—the leave sought should, as the rules require, be "freely given."

*Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

■ Nonetheless, it is well settled that "there is no obligation to allow amendment if to do so would be futile." *Laborers Local 938 Joint Health & Welfare Trust Fund v. B.R. Starnes Co.,* 827 F.2d 1454, 1456 n. 1 (11th Cir.1987) (citing *Foman,* 371 U.S. at 182, 83 S.Ct. at 230). An amendment is futile if the cause of action asserted therein could not withstand a motion to dismiss. *Florida Power & Light Co. v. Allis Chalmers Corp.,* 85 F.3d 1514, 1520 (11th Cir.1996); *Halliburton & Assocs., Inc. v. Henderson, Few & Co.,* 774 F.2d 441, 444 (11th Cir.1985). That is, a court may deny leave to amend when it appears beyond doubt that the proponent can prove no set of facts to support the proposed amendment. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957).

### A. *Opus One's Proposed Amendments.*

Opus One has moved to amend to add a specific prayer for money damages with respect to its trademark infringement claims under the Lanham Act, 15 U.S.C. § 1117(a). Opus One has also moved to amend its complaint to add a count for dilution under the Lanham Act, § 1125(c).

### 1. The Specific Prayer for Damages.

■ Opus One seeks this Court's leave to amend its complaint to add a specific prayer

for money damages with respect to its trademark infringement claims under the Lanham Act, 15 U.S.C. § 1117(a). Fuente argues that the amendment is untimely and would complicate discovery, prejudicing both itself and the Court's interest in judicial efficiency. Opus One is not proposing a new theory of recovery, however. Moreover, in its original complaint, Opus One provided for "such other relief as this Court shall deem just." The Court concludes that this language is sufficiently broad and affords sufficient notice, and that the proposed amendment is sufficiently modest, to negate the probability of undue delay, bad faith or dilatory motive on the part of the Opus One, or undue prejudice to Fuente. *See Foman,* 371 U.S. at 182, 83 S.Ct. at 230. Moreover, the question of the proposed amendment's futility is one of fact, not of law. However unlikely, it is not inconceivable that Opus One may produce evidence tending to show that it has "been damaged by actual consumer confusion or deception" as a result of Fuente's alleged infringement. *See Brunswick Corp. v. Spin-it Reel Co.,* 832 F.2d 513, 525 (10th Cir.1987). Thus, the proposed amendment is not inappropriate, and it comports with justice to allow it. *See* Fed.R.Civ.P. 15(a).

### 2. The Anti–Dilution Claim.

■ Opus One's proposed anti-dilution claim is pursuant to 15 U.S.C. § 1125(c)(1), which provides: "The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection." 15 U.S.C. § 1125(c)(1). While section 1125(c)(2) allows for damages subject to a showing of willful intent "to trade on the owner's reputation or to cause dilution of the mark," Opus One has explicitly limited its remedy to an injunction against further "dilution" of the mark in question, as opposed to damages for wrongful dilution in the past. (Doc. No. 35, ex. A.)

Section 1125(c) was adopted as an amendment to the Lanham Act on June 16, 1996. Fuente argues that, since it adopted the mark at issue prior to that date, and the conduct of which Opus One is complaining also occurred prior to that date, a section 1125(c) claim in this action would be tantamount to a retroactive application of the statute. Opus One counters that, because it seeks only prospective relief under the anti-dilution statute, the issue of retroactivity is not properly at play.

Unlike the constitutional prohibition against ex post facto criminal statutes,[1] the rule that, absent a clear congressional statement to the contrary, a civil statute should not be applied retroactively does not spring from any constitutional prohibition. *See Landgraf v. USI Film Prods.,* 511 U.S. 244, 272, 114 S.Ct. 1483, 1501, 128 L.Ed.2d 229 (1994) (addressing question of whether compensatory and punitive damages provisions of Civil Rights Act of 1991 apply retroactively). Rather, it is a "default rule," or canon of statutory interpretation premised upon "[e]lementary considerations of fairness." *Id.* at 264, 272, 114 S.Ct. at 1497, 1501.

Before it becomes necessary to decide whether Congress intended a statute to be applied retroactively, one should first inquire whether, if applied, the statute would have a retroactive effect in the case at hand. If not, then an excursion into Congressional intent is superfluous. Still, "deciding when a statute operates retroactively is not always a simple or mechanical task." *Landgraf,* 511 U.S. at 266, 114 S.Ct. at 1498. The key, according to the Court, is "whether the new provision attaches new legal consequences to events completed before its enactment." *Id.* at 268, 114 S.Ct. at 1499.

Because prospective relief, by its very nature, attaches legal (as opposed to practical) consequences only to events after the statute's enactment, it has no retroactive effect. As the Supreme Court stated in *Landgraf,* "[w]hen the intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive." *Id.* at 272, 114 S.Ct. at 1501 (citing

---

1. "No state shall ... pass any ... ex post facto law." U.S. Const. Article I, Section 10.

*American Steel Foundries v. Tri–City Central Trades Council,* 257 U.S. 184, 42 S.Ct. 72, 66 L.Ed. 189 (1921)); *see also Hall v. Beals,* 396 U.S. 45, 48, 90 S.Ct. 200, 201, 24 L.Ed.2d 214 (1969). This is because "the purpose of prospective relief is to affect the future rather than remedy the past." *Landgraf,* 511 U.S. at 289, 114 S.Ct. at 1524 (Scalia, J., concurring in the judgment).

Fuente, however, argues that even prospective relief under section 1125(c) may have retroactive effect, and indeed is not to be permitted in a case stemming from pre-enactment events and conduct. For this proposition, Fuente cites several district court cases from outside this Circuit. The most influential of these appears to be *Circuit City Stores, Inc. v. OfficeMax, Inc.,* 949 F.Supp. 409 (E.D.Va.1996), a case cited and followed by the others. *See Resorts of Pinehurst, Inc. v. Pinehurst Nat'l Dev. Corp.,* 973 F.Supp. 552 (M.D.N.C.1997) ("The Court is persuaded that the *Circuit City Stores* court's analysis of the *Landgraf* principles in the context of Dilution Act is an appropriate standard. . . ."); *Viacom, Inc. v. Ingram Enters.,* 965 F.Supp. 1278, 1280 (W.D.Mo. March 21, 1997) ("The Court believes the analysis used by the *Circuit City* court was correct in all respects.").

*Circuit City* involved a suit under section 1125(c) on the part of OfficeMax against CarMax ("Max" being the contested mark). Dismissing the explicit language in *Landgraf* to the contrary as "dicta," *Circuit City,* 949 F.Supp. at 417, the Circuit City court denied that there was any meaningful distinction between the application of damages and prospective relief:

> Whether forced to pay money damages or to suffer an injunction barring future use of the CarMax marks, the effect on CarMax of applying the Dilution Act is effectively the same—CarMax would lose its very identity, achieved as the result of conduct and commercial investment, which was perfectly lawful at the time.

*Id.* at 415.

The *Circuit City* court's conclusion is puzzling. If the language in *Landgraf* stating that prospective relief cannot have retroactive effect is "dicta," then it is nonetheless

dicta that goes to the essence of what "retroactive effect" means. *See Landgraf,* 511 U.S. at 281, 114 S.Ct. at 1506 (emphasizing that compensatory relief, unlike injunctive relief, is "quintessentially backward-looking"); *see also id.* at 270 n. 24, 114 S.Ct. at 1499 n. 24 (juxtaposing retroactive statutes with "uncontroversially prospective statutes"). Indeed, the distinction between prospective relief and damages features elsewhere in the Court's retroactivity jurisprudence. *See Kaiser Aluminum & Chemical Corp. v. Bonjorno,* 494 U.S. 827, 849–50, 110 S.Ct. 1570, 1583–84, 108 L.Ed.2d 842 (1990) (Scalia, J., concurring in the judgment) (noting that injunctive relief cannot be applied retroactively); *see also Lindh v. Murphy,* —— U.S. ——, ——, 117 S.Ct. 2059, 2071, 138 L.Ed.2d 481 (1997) (Rehnquist, J., dissenting) ("[W]e have usually applied changes in law to prospective forms of relief . . . [u]nlike damages actions which are 'quintessentially backward looking.'") (citations omitted).

The *Circuit City* court placed a great deal of weight upon the fact that "the [*Landgraf*] dicta . . . speaks solely to cases in which the relevant conduct was already illegal before the enactment of the new statute." *Circuit City,* 949 F.Supp. at 417. Thus, according to the court in *Circuit City,* the crucial factor was not the nature of the relief but whether the conduct in question was already illegal. In such cases, "the application of purely prospective relief raises no retroactivity concerns because . . . the enforcement of the intervening statute merely provides a new remedy with respect to that conduct." *Id.* Nonetheless, the Supreme Court has made it plain that whether conduct was already prohibited under another provision or another statute is irrelevant to the retroactivity analysis. *See Hughes Aircraft Co. v. United States,* —— U.S. ——, —— – ——, 117 S.Ct. 1871, 1877–78, 138 L.Ed.2d 135 (1997); *see also Landgraf,* 511 U.S. at 281, 114 S.Ct. at 1506 (refusing to consider fact that past conduct in question was already prohibited under Title VII in retroactivity analysis).

At the base of *Circuit City*'s conclusion that prospective relief may have retroactive effect seems to be a concern that a party's justifiable expectations may be frustrated by

such prospective relief. The court emphasized that "CarMax was justified in commencing business over two years before the enactment of the Dilution Act with the *settled commercial expectation* that no dilution claim for damages, let alone a federal claim, existed." *Circuit City*, 949 F.Supp. at 418 (emphasis added). Similarly, the *Circuit City* court found it significant that, prior to enactment of the Dilution Act, "CarMax spent millions of dollars advertising its marks and expanding its business operations." *Id.* at 415.

Expectations, however justified and however dearly purchased, cannot immunize future conduct from legislative fiat. As the Supreme Court has stated, "[a] statute does not operate 'retroactively' merely because it . . . upsets expectations based on prior law." *Landgraf*, 511 U.S. at 266, 114 S.Ct. at 1498. Indeed, statutes routinely impose novel costs on prior business decisions, thereby "unsettl[-ing] expectations and impos[-ing] burdens on past conduct." *Id.* at 270 n. 24, 114 S.Ct. at 1499 n. 24. For instance, "a new property tax or zoning regulation may upset the reasonable expectations that prompted those affected to acquire property; a new law banning gambling harms the person who had begun to construct a casino before the law's enactment or spent his entire life learning to count cards." *Id.; see also Hunter v. United States*, 101 F.3d 1565, 1572 (11th Cir.1996) (" 'Rights' [in the context of *Landgraf* ] should not be construed broadly so as to sweep within its ambit mere expectation interests. . . .").[2]

This Court declines to follow the *Circuit City* court in holding that prospective relief under the anti-dilution statute, premised on conduct or events occurring before its enactment, has a retroactive effect so as to implicate the canon of statutory interpretation with regards to retroactive application of civil statutes. Such prospective relief does not

"attach new *legal* consequences to events completed before its enactment." *Landgraf*, 511 U.S. at 268, 114 S.Ct. at 1499 (emphasis added). If prospective relief under the antidilution statute has any retroactive effect, it is only to foil (potentially) Fuente's expectation interests; and this is not, legally at least, "retroactive effect" at all.

Accordingly, the Court concludes that the proposed amendment is not futile and that it comports with justice to allow Opus One to amend its complaint to add a claim for injunctive relief under the Dilution Act. *See* Fed.R.Civ.P. 15(a).

### B. Fuente's Proposed Amendments

Citing the statements made by the Opus One representative to the *Cigar Insider* trade publication, Fuente has moved to amend its complaint to add a claim under Section 43(a) of the Lanham Act as well as a common-law claim for defamation. Fuente has also moved to add a claim for declaratory judgment that the use of its Fuente Fuente OPUSX trademark by licensees does not infringe upon Opus One's trademark.

#### 1. Section 43(a) of the Lanham Act

Section 43(a) of the Lanham Act, as amended and codified at 15 U.S.C. § 1125(a)(1)(B) provides:

> Any person who, in or .in connection with goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be

---

2. Most, if not all, laws reach into the past. *See* Jill E. Fisch, *Retroactivity and Legal Change*, 110 Harv.L.Rev. 1055, 1073 (1997) ("Rather than asking whether retroactivity is appropriate, we should ask what degree of retroactive impact is appropriate."). In the terminology of one commentator, all laws are at least "weakly retroactive," changing the legal consequences of prior events from the date of the creation of the rule.

*See* Stephen R. Munzer, *Retroactive Law*, 6 J. Legal Stud. 373, 383 (1977). Not all are "strongly retroactive," however; that is, not all change the legal consequences of prior events from the date at which the event occurred, thus operating as if the new rule had always been the law. *See id.* It is only this latter group that implicates the *Landgraf* retroactivity analysis.

liable in a civil action by any person who believes that he or she is likely to be damaged by such an act.

Originally, section 43(a) only addressed statements made by a defendant about its own products: i.e., "false advertising." In 1988, however, it was revised to include the language quoted supra, and that amendment "expanded Section 43(a) of the statute well beyond its usual litigation terrain to include the vast realm of 'commercial defamation claims' and 'unfair competition.'" Paul A. Batista, *A Revolution for the 1990s: Commercial Defamation, the Lanham Act and the Federal Courts*, 64 N.Y.St.B.J. (August 1992).

■ Opus One makes two arguments as to why Fuente cannot make a 43(a) claim in the instant action. First, according to Opus One, the comments made to *Cigar Insider* did not reach Fuente's "goods or services." Second, the comments did not occur in the context of "commercial advertising or promotion." The first argument fails according to the plain language of the statute, which makes actionable statements pertaining, not only to goods and services, but also to "commercial activities." 15 U.S.C. § 1125(a)(1)(B). In stating that Fuente was trying "to trade on [Opus One's] reputation," and that Fuente had "effectively appropriated" Opus One's mark, Opus One was plainly making statements about Fuente's commercial activities.

■ The more difficult question is whether the statements occurred in the context of "commercial advertising or promotion." The correct interpretation of this phrase appears to be a question of first impression in this Circuit. It is clearly limiting language, but the legislative history of the statute reveals an apparent schizophrenia as to how limiting it is. In the House, Representative Kastenmeier cautioned that "the reach of the section specifically extends only to false and misleading speech that is encompassed within the 'commercial speech' doctrine by the United States Supreme Court." 134 Cong. Rec.H. 10420 (Oct. 19, 1988) (statement of Rep. Kastenmeier). The Senate, on the other hand, appeared to entertain a more generous conception of section 43(a)'s ambit: "It is ... Congress' intent that the 'commercial'

language be applicable any time there is a misrepresentation relating to goods or services." 134 Cong.Rec. S 16873 (Oct. 20, 1988) (Sen DeConcini). *But see National Artists Management Co. v. Weaving*, 769 F.Supp. 1224, 1232 (S.D.N.Y.1991) ("The Senate's expansive reading of the word 'commercial' makes the word 'commercial' superfluous. . . .").

The concern common to both the House and Senate is section 43(a)'s potential extension beyond commercial speech. *See* 134 Cong.Rec. S 16873 (Oct. 20, 1988) (Sen DeConcini) ("The word 'commercial' is intended only to eliminate any possibility that the section might be applied to political speech."); *see also Gordon & Breach Science Publishers v. American Inst. of Physics*, 859 F.Supp. 1521, 1533 (S.D.N.Y.1994) ("Section 43(a) was not intended to apply, and cannot constitutionally be applied, to representations other than those determined to be commercial speech."). Thus, in attempting to decide whether statements were made in "commercial advertising or promotion," the Court looks to whether the statements were "commercial" speech for the purposes of the First Amendment.

The Court has recognized "the difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417, 113 S.Ct. 1505, 1511, 123 L.Ed.2d 99 (1993); *see also Rubin v. Coors Brewing Co.*, 514 U.S. 476, 492, 115 S.Ct. 1585, 1595, 131 L.Ed.2d 532 (1995) (Stevens, J., concurring in the judgment) (noting the "artificiality of a rigid commercial/noncommercial distinction."). At a minimum, commercial speech is "speech proposing a commercial transaction." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 762, 96 S.Ct. 1817, 1825, 48 L.Ed.2d 346 (1976).

The Court itself has recognized that such a definition is often too cramped, however, to embrace the entire universe of "commercial speech." *See Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983) (articulating more organic conception of commercial speech taking into account references to products, the motive

behind the speech etc.). Indeed, the whole impetus behind a cause of action for commercial defamation would appear to rest on the practical reality that one may court consumers simply by disparaging one's competitors.[3] Commercial speech may have less to do with what is said than one's motive for saying it. *See Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 U.S. 557, 561, 100 S.Ct. 2343, 2348, 65 L.Ed.2d 341 (1980) (defining commercial speech as "expression solely related to the economic interests of the speaker and its audience."); *see also Rubin,* 514 U.S. at 492, 115 S.Ct.. at 1595 (Stevens, J., concurring in the judgment) ("If the Coors label is commercial speech, then, I suppose it must be because … the motivation of the speaker is to sell a product. . . .").

With regards to section 43(a) at least, the most relevant indicia as to whether the speaker's motive is purely commercial (and thus whether speech is commercial) may involve who is speaking, and to whom one is speaking. In other words, is the speaker in competition with the subject, and is the speech aimed especially at consumers over whom the speaker and subject are vying? Thus, disparaging comments made about a plaintiff's product in Consumer Report would not be actionable because the magazine is not competing (presumably) with the plaintiff. *See* 134 Cong.Rec. H 10420–21 (statement of Rep. Kastenmeier) (suggesting that section 43(a) was not intended to reach, for example, "a Consumer Report which reviews and may disparage the quality of … products."). Alternatively, a competitor's statements made to a general news organization like the *New York Times* might not be actionable because they are not aimed specifically at the contested market.

This reading of "commercial advertising or promotion" comports with, and largely harmonizes, the rather scattered case law interpreting the revised section 43(a). In *Wojnarowicz v. American Family Assoc.,* 745

F.Supp. 130 (S.D.N.Y.1990), for example, the United States District Court for the Southern District of New York confronted the issue of whether an artist might sue a religiously oriented not-for-profit organization under 43(a) for disparaging comments it made about his work in a pamphlet that it distributed to members of Congress. The court began by noting that "[S]ection 43(a) has never been applied to stifle criticism of the goods or services of another by one, such as a consumer advocate, *who is not engaged in marketing or promoting a competitive product or service." Id.* at 141 (emphasis added). In concluding that the religious organization could not be held liable under section 43(a), the court emphasized that it was not "not selling a product, and certainly not distributing a product *in competition with plaintiff." Id.* at 141 (emphasis added).

In *National Artists Management Co. v. Weaving,* 769 F.Supp. 1224 (S.D.N.Y.1991), the same court concluded that a company engaged in business of "booking talent" for theatrical productions had a cause of action under 43(a) against its former officer for disparaging it in phone calls to customers. The court conceded that phone calls were not " 'commercial advertising or promotion' in the traditional sense." *Id.* at 1235. Nonetheless, looking to the "context" of the defendants' speech acts, i.e., to the fact that the defendant was attempting to establish a rival company and was directing her disparaging statements to a contested customer base, the court decided that they were "advertising or promotion" for purposes of 43(a). *Id.*

Likewise, in a case very similar to the one at hand, the United States Court of Appeals for the Sixth Circuit held that an article in a trade journal, written by a defendant and allegedly disparaging the plaintiff, was "in commercial advertising or promotion." *Semco, Inc. v. Amcast, Inc.,* 52 F.3d 108, 113–14 (6th Cir.1995). Looking past the journalistic trappings of the trade journal, the Sixth Cir-

---

3. This is the essence of negative advertising. In the political sphere, it is widely recognized that a "negative ad" disparaging one candidate can work to his or her opponent's advantage, even when the opponent is never mentioned. *See, e.g.,* Elizabeth Kolbert, *Experts Saying Negative Ads Will Be Around for a While,* N.Y. Times, Mar. 2,

1996, at A5; Elizabeth Kolbert, *With a Commercial Crossfire, G.O.P. Race Stays Negative,* N.Y. Times, Feb. 17, 1996, at A1; David Rosenbaum, *In Minnesota Race, Negative Ads Outnumber the Lakes,* N.Y. Times, Oct. 23, 1996, at A3; Roger Stone, *Positively Negative,* N.Y. Times, Feb. 26, 1996, at A3.

cuit concluded that the article functioned in a manner akin to an advertisement or a promotion. *See id.* at 113; *see also H & R Indus. v. Kirshner,* 899 F.Supp. 995, 1006 (E.D.N.Y.1995) (refusing to dismiss 43(a) claim as it pertained to anonymous memorandum alleging that an officer of the plaintiff company was engaging in improper business activity—"[T]he memorandum could be considered to have a variety of purposes, some direct and others indirect, and still be deemed a form of trade disparagement under the Lanham Act.").[4]

Applying this distilled analysis to the case at hand, it is not difficult to say that the comments made by the Opus One representative in the Cigar Insider occurred in "commercial advertising or promotion" for the purposes of section 43(a). First, Opus One and Fuente are competitors. In its complaint, Opus One situates wine and cigars within a single market: "Alcoholic beverages, including wine, and cigars are closely related in the marketplace. . . ." (Doc. No. 49, ex. A ¶ 19.) Moreover, there are facts tending to show that Opus One has designs upon the burgeoning cigar market. (Doc. No. 25, ex. E.) That Opus One's involvement in that market has not been realized does not remove it from potential liability under section 43(a). *See National Artists,* 769 F.Supp. at 1233 ("Section 43(a) will apply to misleading or false advertising that occurs before any products are actually sold."). Were it otherwise, a business entity might "destroy an anticipated competitor through false representations made during the period before the commencement of the new business, and then pick up the pieces of the ruined business." *Id.* at 1234.

Furthermore, by making the statements in question within a trade publication, Opus One effectively directed them toward contested

consumers. *See Semco,* 52 F.3d at 113–14. Trade publications are different in kind from general news publications or magazines. They are by their very nature commercial. Indeed, because of this, the question of whether a mark has been used in trade journals is one of the relevant factors in determining whether it has achieved "secondary meaning," and thus has been "used in commerce," for purposes of the "false advertising" provision of section 43(a). *See, e.g., Ford Motor Co. v. Summit Motor Prods., Inc.,* 930 F.2d 277, 292 (3d Cir.1991).

Thus, the Court concludes that the statements made by the Opus One representative in Cigar Insider were "in commercial advertising or promotion" for purposes of section 43(a). Therefore, the proposed amendment is not futile, and it comports with justice to allow Fuente to amend its complaint to add a claim under that portion of the Lanham Act. *See* Fed.R.Civ.P. 15(a).

### 2. The Common–Law Defamation Claim

Fuente has also moved to amend its complaint to add a claim for defamation, based on the same statements that form the basis of the section 43(a) claim. "Defamation (libel and slander) may generally be defined as the unprivileged publication of false statements which naturally and proximately result in injury to another." *Wolfson v. Kirk,* 273 So.2d 774, 776 (Fla. 4th DCA 1973). The *Wolfson* court addressed the issue of whether the statement "When I was running Hayden Stone, we invited [plaintiff] out of the office," was defamatory. The court concluded that, because "the comment attributes to the plaintiff a characteristic which is incompatible with the conduct of any lawful business," it was defamatory. *Id.* at 778. The statements at issue here similarly attribute to Fuente conduct that is incompatible with law-

---

**4.** *But cf. Gordon & Breach Science Publishers v. American Inst. of Physics,* 859 F.Supp. 1521 (S.D.N.Y.1994) (concluding that article in journal operated by non-profit defendant that disparaged journal operated by for-profit plaintiff was not "in commercial advertising or promotion"). The *Gordon & Breach* court's holding appears to depend on the policy that "[n]on-profit organizations must be free to participate fully in the marketplace of ideas without fear of sanctions, even if such participation redounds to their fi-

nancial benefit." *Id.* at 1541. The *Gordon & Breach* court expressly limited its holding, however, stating "we do not consider whether we would reach a different result if the articles in question were authored by a commercial entity . . . or if they were published *in the trade journal* of a commercial enterprise or industry." *Id.* at 1542 (emphasis added). In any case, the court acknowledged that "the Act's reach is broader than merely the 'classic advertising campaign.' " *Id.* at 1534.

ful business, and so a rational trier of fact could find them defamatory. *See also Abrams v. General Ins. Co.*, 460 So.2d 572 (Fla. 3d DCA 1984).

■ Opus One does not appear to deny that a reasonable trier of fact could find the statements made by its representative in the *Cigar Insider* defamatory. Instead, Opus One argues that the statements fall within two sorts of privilege: "mere opinion" privilege and the qualified privilege to make statements regarding ongoing litigation. Mere opinion is privileged and protected comment under the First Amendment. *See, e.g., Smith v. Taylor County Pub. Co.*, 443 So.2d 1042 (Fla. 1st DCA 1983); *Eastern Air Lines, Inc. v. Gellert*, 438 So.2d 923 (Fla. 3d DCA 1983). This is because "[h]owever pernicious an opinion may seem, we depend for its correction not on the conscience of judges but on the competition of other ideas." *Gertz v. Robert Welch*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

Nonetheless, to preface defamation with a phrase like "In my View," or "In our opinion," does not afford it a talismanic immunity. As the Supreme Court has stated, "we do not think that ... *Gertz* was intended to create a wholesale defamation exception for anything that might be labeled 'opinion.'" *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18, 110 S.Ct. 2695, 2705, 111 L.Ed.2d 1 (1990). In particular, mixed expression of opinion (as opposed to "pure opinion") is not constitutionally protected. *See Madsen v. Buie*, 454 So.2d 727 (Fla. 1st DCA 1984). "Mixed expression of opinion occurs when an opinion or comment is made which is based upon facts regarding the plaintiff or his conduct that have not been stated in the article or assumed to exist by the parties to the communication." Restatement (Second) of Torts § 566, *quoted in From v. Tallahassee Democrat, Inc.*, 400 So.2d 52 (Fla. 1st DCA 1981).

When Opus One's representative stated that Fuente was "trading on our reputation" and that Fuente had "appropriated" Opus One's mark, that individual was relating an opinion based on facts that had not been disclosed to the readers of *Cigar Insider*. In other words, Opus One was implying undisclosed, potentially defamatory facts. Even when stated in the form of an opinion, such a statement does not fall within the "pure opinion" privilege. *See Florida Med. Center v. New York Post*, 568 So.2d 454, 458 (Fla. 4th DCA 1990) (citing Restatement (Second) of Torts § 566).

■ Alternatively, Opus One argues, the statements made in Cigar Insider are protected by the qualified privilege to make statements regarding ongoing litigation. "The doctrine is well settled that defamatory words when used by parties, counsel, or witnesses in the due course of judicial procedure, and when relevant to the subject of inquiry, are privileged and cannot be made the basis of a proceeding for libel or defamation." *Ange v. State*, 98 Fla. 538, 123 So. 916, 917 (1929), *quoted in Pledger v. Burnup & Sims, Inc.*, 432 So.2d 1323, 1325–26 (Fla. 4th DCA 1983). It is crucial, however, that the statements be made "in the due course of judicial procedure," *id.*, for "why should a person be absolutely privileged to defame another in the course of a judicial proceeding by making slanderous statements wholly outside the inquiry before the court?" *Myers v. Hodges*, 53 Fla. 197, 44 So. 357, 361 (1907).

It is manifest that the statements made to *Cigar Insider*, statements made at the very onset of litigation and upon Opus One's own initiative, did not occur in the due course of judicial procedure and, thus, are not entitled to any qualified privilege.[5] Because the statements in question are potentially defamatory, and because they do not fall within either of the privileges asserted by Opus One, the Court concludes that the proposed amendment is not futile and that it comports with justice to allow it. *See* Fed.R.Civ.P. 15(a).

### 3. The Declaratory Judgment Claim

Fuente has also moved to add a claim for declaratory judgment that the use of its

---

**5.** Opus One relies on *Huszar v. Gross*, 468 So.2d 512 (Fla.App. 1st DCA 1985) for a broader application of the privilege (so as to allow parties to make reports on on-going litigation to newspapers etc.). But that case makes clear that such a privilege may be extended only "so long as [the reports] are accurate, fair, and impartial,"—i.e., so long as they are not defamatory. *Id.* at 513.

1458

Fuente Fuente OPUSX trademark by licensees does not infringe upon Opus One's trademark. Opus One does not oppose this particular amendment. The Court therefore concludes that the proposed amendment does not threaten undue prejudice to Opus One. *See Foman,* 371 U.S. at 182, 83 S.Ct. at 230. Likewise, the proposed amendment does not seem likely to cause undue delay, nor to stem from bad faith or dilatory motive on the part of the Fuente. *See id.* The Court therefore concludes that it comports with justice to allow the proposed amendment. *See* Fed. R.Civ.P. 15(a).

Accordingly, pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, it is **ADJUDGED AND ORDERED** that Plaintiff/Counter–Defendant Fuente's Motion to Amend (Doc. No. 25, filed May 2, 1997), Defendant/Counter–Plaintiff Opus One's Motion to Amend (Doc. No. 34, filed June 17, 1997), and Opus One's Motion to Amend to Add a Specific Prayer for Damages (Doc. No. 48, filed July 21, 1997) are **GRANTED.**